PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-3010

———————

BRAND MARKETING GROUP LLC, d/b/a Thermablaster

v.

INTERTEK TESTING SERVICES, N.A., INC.,
d/b/a Intertek Testing Servicing;
CONTINENTAL APPLIANCES, INC., d/b/a Procom

Intertek Testing Services, N.A., Inc.,
                                                        Appellant

———————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-12-cv-01572)
District Judge:  Honorable Arthur J. Schwab

———————

Argued on April 28, 2015
Before:  FISHER, HARDIMAN and ROTH, *Circuit Judges*.

(Filed: September 10, 2015)

Brendan B. Lupetin, Esq.   (Argued)
Meyers, Evans & Associates
707 Grant Street
Gulf Tower, Suite 3200
Pittsburgh, PA 15219
　　　*Counsel forAppellee*

William T. Hangley, Esq.   (Argued)
Matthew A. Hamermesh, Esq.
Dina L. Hardy Grove, Esq.
Hangley, Aronchick, Segal, Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103
　　　*Counsel for Appellant*

---

OPINION

---

HARDIMAN, *Circuit Judge*.

　　　This case comes to us following a jury verdict in favor of Brand Marketing Group, LLC. The jury found Defendant Intertek Testing Services, N.A., Inc. liable to Brand for negligent misrepresentation and awarded Brand more than $6 million in total damages—$1,045,000 in compensatory and $5 million in punitive damages. After an adverse ruling on its post-trial motions, Intertek filed this appeal from the District Court's final order. We will affirm.

# I

## A

Brand is a small company founded in 2004 by David Brand.[1] Until about 2008, Brand sold vent-free heaters—products that provide gas heat without having to vent outdoors—made by a company called ProCom. At that point, Brand began developing the Thermablaster, a vent-free heater that purportedly improved on ProCom's design.

Through some industry contacts, Brand was introduced to a Chinese company called Reecon M&E Co., Ltd. that would manufacture the Thermablasters. Reecon, in turn, suggested that Brand use Intertek to test the heaters to ensure they met U.S. safety standards. Intertek, an international product-testing company with more than 35,000 employees, had an ongoing relationship with Reecon, and Reecon wanted to extend that relationship to include the Thermablasters.

Before accepting Reecon's testing suggestion, David Brand did some research. He attended a trade show where he spoke with two Intertek representatives who indicated that their company could test the Thermablasters. He also received and examined a promotional leaflet and visited the company's website, which indicated that Intertek could test to any standard promulgated by the American National Standards Institute (ANSI). Later, he exchanged emails with the trade show representatives, who suggested that the Thermablasters be tested at Intertek's facility in China.

---

[1] Where the difference between company and owner matters, we refer to the latter by his first and last names; otherwise, we refer to them as "Brand" interchangeably.

Satisfied that Intertek and its China facility had the expertise to do the testing, Brand allowed Reecon to use Intertek to test the heaters. Reecon then applied to have the Thermablasters tested by Intertek, stating on its application that the heaters should be tested against the most recent applicable ANSI standard (Z.21.11.2b), and that "BMG"—Brand Marketing Group—was the ultimate buyer of the heaters. Although Reecon contracted with and paid Intertek about $22,000, the cost of testing was passed through to Brand as part of the per-unit price Reecon charged Brand for the heaters.

Having established manufacturing and testing programs for its product, Brand struck a deal in April 2011 with Ace Hardware Corp., which agreed to pay Brand some $467,000 for 3,980 Thermablasters. Three months later, Intertek tested the heaters and found that they met the ANSI standard. Shortly after testing was completed, David Brand visited China to monitor production. While he was there, Reecon gave Brand a Test Data Sheet—an Intertek document signed by several of its engineers—showing that the heaters had passed all relevant tests. Satisfied that the heaters complied with the applicable standard, Brand bought 5,500 heaters from Reecon, and delivered the Thermablasters to Ace within a couple of months.

Ace began selling the heaters in late 2011 but halted sales permanently after ProCom—the company whose products Brand had formerly sold—notified Ace that the Thermablasters did not meet ANSI standard Z.21.11.2b. Brand initially defended its product, pointing to Intertek's Test Data Sheet as evidence that the heaters met the ANSI standard. Because the heaters were actually noncompliant, however, Ace refused to sell them and demanded that Brand

4

repossess the heaters and refund its payment. Brand could do neither, as the company lacked the means to retrieve the heaters and had already spent the funds it received from Ace. As a result, Ace sued Brand and obtained a default judgment for about $611,060 (Ace's purchase price plus interest and costs), thus wiping out Brand's anticipated profit of about $147,000.

Brand then sued Intertek alleging, *inter alia*, fraudulent and negligent misrepresentation. Intertek countersued, alleging trademark infringement (among other claims) because Brand had placed Intertek's testing certification mark—which indicates to consumers that Intertek has certified that a product meets applicable safety standards—on Thermablaster boxes prior to receiving Intertek's permission to do so. During pretrial proceedings, Intertek bought Ace's $611,060 judgment against Brand for $250,000. Intertek aggressively tried to collect its judgment in the weeks leading up to trial, attempting, among other tactics, to transfer the judgment from the company to David Brand personally.

Before trial, Brand withdrew its fraudulent misrepresentation claim. As relevant to this appeal, the parties proceeded to trial on the negligent misrepresentation and trademark infringement claims.

B

During the three-day trial held in March 2014, the jury heard testimony from several witnesses, including Intertek's chief engineer for heating products, Frederick Curkeet. Curkeet testified that vent-free heaters posed "a big risk in terms of overheating and carbon monoxide poisoning" in consumers' homes if they did not meet safety standards and

that he knew Intertek's customers relied on their testing results. App. 772. Despite that understanding, Curkeet admitted that Intertek lacked a "complete process" to ensure that Intertek's facilities around the world tested consistently to ANSI standards. Nor did Intertek share "best practice[s]" among facilities, even though Curkeet acknowledged that such knowledge-sharing would be ideal. App. 802. Moreover, Curkeet stated that in the past "quite a number [of Intertek] engineers" had been caught "slacking off on the job and saying things complied without running the test," though he maintained that Intertek always fired those employees promptly. App. 842.

Curkeet also testified that, although ANSI standard Z.21.11.2b was written in English, Intertek did not translate it for the Chinese engineers who tested the Thermablaster. Intertek didn't do so, he said, because the standard's engineering jargon didn't translate well from English to Chinese. The company decided not to translate even though the Chinese engineers' English was imperfect: as Curkeet noted, "it's obvious it's not their first language," and "sometimes the language issues do creep into the documentation." App. 800–01. In regard to the Thermablaster testing, he agreed that "something got lost in translation." App. 802. Furthermore, Curkeet stated that Intertek had never before tested to Z.21.11.2b and that training and experience in the China facility were lacking. He said that although he was on the ANSI committee that wrote the applicable standard, he did not directly supervise the Chinese engineers who tested the heaters. Had he done so, Curkeet stated, Intertek would not have erroneously certified the Thermablasters.

At the close of trial, the District Court instructed the jury that it could award punitive damages to Brand if it found

6

that Intertek's conduct was outrageous, even though Brand's claim was for negligent, not fraudulent, misrepresentation. The jury did just that, returning a verdict for Brand in the amount of $6,045,000. That figure included $725,000 in past compensatory damages, $320,000 in future compensatory damages, and $5 million in punitive damages. The jury also found for Intertek on the trademark infringement claim but awarded no damages because the infringement was not willful.

C

After the jury verdict was announced, Intertek moved for post-trial relief under Federal Rules of Civil Procedure 50 and 59. It requested (1) judgment as a matter of law or a new trial on the punitive damages claim because Brand had not shown that Intertek had acted recklessly; (2) a reduction in punitive damages because the award violated the Due Process Clause of the Fourteenth Amendment; (3) a reduction in compensatory damages because Brand had shown only about $320,000 in actual loss; (4) a new trial because the jury verdicts on Brand's claim and Intertek's counterclaim were inconsistent; (5) a set-off to the judgment equal to the judgment against Brand that Intertek had purchased from Ace; and (6) a new trial because of allegedly erroneous evidentiary rulings by the District Court. The District Court granted the requested set-off but denied the remainder of Intertek's motion. Intertek filed this timely appeal.

II

Brand is a limited liability company, so its citizenship "is determined by the citizenship of its members." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282 (3d

7

Cir. 2014) (citation omitted). Because its owner David Brand is a citizen of Pennsylvania, the company is likewise a citizen of Pennsylvania. Intertek is a citizen of New York and Delaware, and the amount in controversy is more than $75,000. The District Court therefore had diversity jurisdiction under 28 U.S.C. § 1332, and removal from state court (where this case originated) was proper under 28 U.S.C. § 1441. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## III

Intertek raises several arguments that we shall address in order of importance. First, we consider Intertek's argument that Brand's case was foreclosed by the economic loss doctrine. We then analyze Intertek's various challenges to the damages awards: that (1) the compensatory award was legally improper; (2) the compensatory award was factually irrational; (3) punitive damages are per se unavailable for negligent misrepresentation; (4) the District Court lacked a factual basis on which to issue a punitive damages jury instruction; and (5) the punitive damages award violated the Due Process Clause of the Fourteenth Amendment. Finally, we assess the consistency of the jury's verdicts.

## A

Intertek claims that Brand's negligent misrepresentation claim was barred by Pennsylvania's economic loss doctrine. This is a purely legal question, so we exercise plenary review over the District Court's holding that an exception to the economic loss doctrine permitted the claim. *Addie v. Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013). The

8

parties agree that Pennsylvania law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

The economic loss doctrine "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008) (quoting *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003)). Notwithstanding the general rule, the Supreme Court of Pennsylvania has recognized an exception specifically for negligent misrepresentation claims. In *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270 (Pa. 2005), the court expressly adopted Restatement (Second) of Torts § 552. *Id.* at 285. Section 552 provides:

> (1) One who, in the course of his business . . . [negligently] supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information . . . .
>
> (2) [This liability] is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that

9

the recipient so intends or in a substantially similar transaction.

Intertek acknowledges the *Bilt-Rite* exception, but argues that § 552 is unavailing to Brand because it was not in the "limited group" of people "for whose benefit and guidance" Intertek provided information. Specifically, Intertek contends that the information David Brand received from its website could not have been the basis of a valid negligent misrepresentation claim because information on the Internet is provided to the public, not to a limited group. And it argues that a valid claim could not be based on the Test Data Sheet because that information was provided to Reecon, not Brand directly (even though Brand eventually received it).

Even if Intertek is correct that a website cannot provide the foundation for a negligent misrepresentation claim, it is wrong that the Test Data Sheet could not do so. Intertek urges us to read § 552 to mean that a negligent misrepresentation claim is viable only when a defendant provides information *directly* to a plaintiff. We decline to do so because that reading is contradicted by the plain text of § 552(2)(a), which permits claims by a third party when a professional provides information and "knows that the recipient intends to supply it" to the third party. That is precisely what happened here: Intertek knew that Reecon was not the only party relying on its testing information based on Reecon's testing application that listed "BMG" as a buyer of the Thermablasters.

In any event, the *Bilt-Rite* exception applies even if Intertek did not know that "BMG" meant that Brand was the buyer of the heaters, as it asserts in its reply brief. In discussing its rationale for adopting § 552, the Pennsylvania

10

Supreme Court noted that an information supplier's liability for negligent misrepresentation does not depend on the supplier's knowledge of the recipient's identity:

> [W]ith fewer generalists and more experts operating in the business world, business persons have found themselves in a position of increasing reliance upon the guidance of those possessing special expertise. Oftentimes, the party ultimately relying upon the specialized expertise has no direct contractual relationship with the expert supplier of information, and therefore, no contractual recourse if the supplier negligently misrepresents the information to another in privity. And yet, the supplier of the information is well aware that this third party exists (*even if the supplier is unaware of his specific identity*) and well knows that the information it has provided was to be relied upon by that party. Section 552 . . . hold[s] such professionals to a traditional duty of care for foreseeable harm.

*Bilt-Rite*, 866 A.2d at 286 (emphasis added).

As *Bilt-Rite* makes clear, Intertek didn't need to know that Brand, specifically, would rely on its testing data for § 552 to apply. Instead, Intertek needed to know only that *somebody* aside from Reecon would rely on it—and, given that Reecon's testing application listed multiple parties as "Buyer[s]" of the Thermablasters, it certainly knew that much. Therefore, the District Court correctly permitted Brand's negligent misrepresentation claim to proceed under

11

Pennsylvania's *Bilt-Rite* exception to the economic loss doctrine.

B

Intertek next contends that the jury's compensatory damages award—$725,000 for past damages and $320,000 for future damages—was excessive. We apply a mixed standard of review to this issue. We review de novo whether the District Court applied the appropriate measure of damages. *VICI Racing*, 763 F.3d at 283. But if the District Court committed no legal error, our factual review of a compensatory damages award is "exceedingly narrow"—we will not disturb a jury's decision "so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 (3d Cir. 2010) (citations omitted).

1

The gist of Intertek's legal argument regarding compensatory damages is this: Restatement (Second) of Torts § 552B governs damages awards for negligent misrepresentation, and it permits damages only for actual losses, which do not include "benefit-of-the-bargain" damages or lost profits. Because all but $320,368 (the amount Brand paid Reecon for the heaters) of Brand's losses were something other than "actual," Intertek argues, we must reduce the jury's compensatory award to that amount.

Section 552B describes the damages recoverable for negligent misrepresentation as:

12

(1) . . . [T]hose necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Comment b to that section explains that § 552B "rejects, as to negligent misrepresentation, the possibility that . . . the plaintiff may also recover damages that will give him the benefit of his contract with the defendant." Restatement (Second) of Torts § 552B cmt. b.

Although the Pennsylvania Supreme Court expressly adopted § 552 in *Bilt-Rite*, it has yet to adopt § 552B. Nor have the parties cited any cases from Pennsylvania appellate courts so holding. Despite this "dearth of Pennsylvania case law explaining damages recoverable under a cause of action for negligent misrepresentation," *Merrill Iron & Steel, Inc. v. Blaine Constr. Corp.*, 2014 WL 2993774, at *7 (W.D. Pa. July 2, 2014), we believe that the Pennsylvania Supreme Court would adopt § 552B. Neither Intertek nor Brand encourages us to look elsewhere for the applicable law and,

13

given § 552B's close relationship with § 552, we see no reason to do so either.

Intertek argues that Brand cannot recover the benefit of its Ace contract or other lost profits (presumably from potential future deals with Ace) under § 552B. The District Court disagreed, noting that § 552B(2) and comment b "only prohibit[] a plaintiff from realizing the benefit of its contract with defendant, here Intertek, presumably because such damages are recoverable under the alternative theory of breach of contract." *Brand Mktg. Grp., LLC v. Intertek Testing Servs. NA, Inc.*, 2014 WL 2094297, at *21 (W.D. Pa. May 20, 2014). According to the District Court, Section 552B permitted Brand to recover the benefit of its bargain with Ace, a non-defendant third party. In response, Intertek counters that "[a] party's affairs cannot be subdivided so finely" to distinguish between the benefit of a bargain with a defendant and the benefit of a bargain with a third party. Intertek Br. 30. "The benefit to a manufacturer of its relationship with a retailer," it argues, "is indivisible from the benefit of its relationship with a vendor. From either perspective, the benefit is the profit from its business." *Id.*

In our view, Intertek's failure to explain why such benefits are indistinguishable in light of § 552B makes its argument unpersuasive. Intertek asks us to conclude that when § 552B excises "the benefit of the plaintiff's contract with the defendant" from negligent misrepresentation damages, it actually means to preclude *all* lost profits that a plaintiff might suffer as a result of a defendant's misrepresentation. Yet Intertek provides no reason why we should predict that the Pennsylvania Supreme Court would adopt § 552B but decline to give meaning to all of its words. Reading that section as Intertek urges would render "with the

14

defendant" meaningless in § 552B(1)(b) and in comment b. Such a reading is unsound as a matter of both logic and textual interpretation. *Cf. Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (quoting 2A Norman J. Singer, *Statutes and Statutory Construction* § 46.06 (rev. 6th ed. 2000) (alteration in original))).

We agree with the District Court that, while § 552B prohibits a plaintiff from recovering the benefit of its bargain with the defendant in a negligent misrepresentation case, it allows such a plaintiff to recover the lost benefit of a contract formed with an entity other than the defendant. And we can conceive of no principled reason to believe that the Pennsylvania Supreme Court would adopt § 552B—as Intertek urges—yet effectively read the words "with the defendant" out of it. Accordingly, we predict that the Pennsylvania Supreme Court would adopt § 552B and interpret it as allowing benefit-of-the-bargain damages (and lost profit damages) in a negligent misrepresentation case except when those lost profits stem from a plaintiff's contract with the defendant.

2

Because the District Court did not err in identifying and interpreting the applicable legal standard, we next consider whether the jury's award was rational, keeping in mind that our standard of review of a jury's compensatory award is "exceedingly narrow." *Cortez*, 617 F.3d at 718. If both parts of the jury's award—$725,000 for past and $320,000 for future damages—are supported by some evidence in the record, we must uphold the award.

15

The jury's future damages award was supported by the facts. At trial, Brand called an accounting expert to testify regarding its lost future profits. He testified that the amount that Brand had lost due to Intertek's misrepresentations was somewhere between $439,000 and $1 million over the next decade. The jury reduced that range to $320,000 because the expert's analysis did not fully persuade them. Juries may discount evidence based on credibility determinations, and that's exactly what happened here.

The past damages award of $725,000 was likewise rational. Absent Intertek's misrepresentation that the Thermablasters met the ANSI standard, Brand would have learned of the safety issues with the heaters prior to large-scale production; at that point, David Brand testified, those problems would have been "very easy" to fix. App. 943. The jury therefore could have rationally concluded that, but for Intertek's tort, the problems with the Thermablasters would have been resolved at little cost to Brand. Brand then would have fulfilled its contract with Ace and made, as the accounting expert testified, a profit of about $147,000. This profit was the difference between $467,276 (the amount Brand received from Ace pursuant to their contract) and $320,368 (the amount Brand paid Reecon for the Thermablasters). Instead of earning that profit, however, Brand wound up owing a $611,060 judgment (an amount equal to Ace's purchase price plus costs and interest) when it delivered the faulty heaters to Ace.

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001) (citing Restatement (Second) of Torts § 903; *Pac. Mut. Life Ins. Co.*

16

*v. Haslip*, 499 U.S. 1, 54 (1991) (O'Connor, J., dissenting)). Here, the jury's past compensatory damages award did just that. The award canceled out the $611,060 judgment against Brand (and provides for interest and costs incurred by Brand in pursuing its rights against Intertek). By effectively eliminating that judgment (a "concrete loss" to Brand), the past compensatory award restored Brand to the position it would have been in absent Intertek's tort—with a net profit on the Ace contract of about $147,000. For the reasons stated previously, we believe that the Pennsylvania Supreme Court would permit recovery of such benefit-of-the-bargain damages. Accordingly, the past compensatory award, like the future compensatory award, was rational, and the District Court did not err in allowing it to stand.

C

Intertek argues that the jury's $5 million punitive damages award was improper on three separate grounds. First, it argues that punitive damages are per se unavailable for negligent misrepresentation claims. Alternatively, it claims there was no factual basis for the District Court to instruct the jury on punitive damages in this case. Finally, it argues that even if the instructions were proper, the jury's punitive award violated the Due Process Clause of the Fourteenth Amendment. We consider each argument in turn.

1

Intertek contends that a Pennsylvania jury may never award punitive damages in a negligent misrepresentation case. We exercise plenary review over this legal question. *Addie*, 737 F.3d at 867; *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997). As the District Court

17

correctly acknowledged, this argument presents a narrow question of first impression, as neither our Court nor the Supreme Court of Pennsylvania has addressed whether punitive damages are available for negligent misrepresentation claims.

Our analysis of this argument does not begin on a blank slate, though. The Pennsylvania Supreme Court has held that punitive damages may be awarded in negligence cases if the plaintiff proves greater culpability than ordinary negligence at trial. *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 773 (Pa. 2005). In *Hutchison*, the court stated that while a showing of ordinary negligence cannot support a punitive damages award, "neither is there anything in law or logic to prevent the plaintiff in a case sounding in negligence from undertaking the additional burden of attempting to prove . . . that the defendant's conduct not only was negligent but that the conduct was also outrageous," such that it warrants punitive damages. *Id.* at 772. "The penal and deterrent purpose served by . . . punitive damages is furthered when the outrageous conduct occurs in a case sounding in negligence no less than when an intentional tort is at issue." *Id.*

Against that background, Intertek asks us to declare that negligent misrepresentation claims are so different from other "case[s] sounding in negligence" that they can never be grounds for punitive damages awards in Pennsylvania. In effect, Intertek requests us to predict that the Pennsylvania Supreme Court would create an exception specifically for negligent misrepresentation cases to the general rule it announced in *Hutchison*. We decline to do so.

As with its primary compensatory damages argument, Intertek's claim that punitive damages are per se unavailable

for negligent misrepresentation claims under Pennsylvania law is based on Restatement § 552B. It argues that punitive damages are unavailable for such claims because § 552B authorizes only compensatory damages. Although Intertek is correct that § 552B does not expressly authorize punitive damages— it states instead that a negligent misrepresentation plaintiff may recover damages "necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause," Restatement (Second) of Torts § 552B(1)—its argument is still mistaken.

Unlike Intertek, we ascribe no significance to that section's omission of punitive damages. In fact, it would be unusual if § 552B did specifically indicate that punitive damages are available for negligent misrepresentation. By definition—and unlike compensatory damages—punitive damages are left to the discretion of the jury and need not be defined on a tort-by-tort basis. Accordingly, the Restatement defines punitive damages generally, untethered to any individual tort, as "damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter . . . similar conduct in the future." *Id.* § 908. While punitive damages may not be awarded for actions that "constitute ordinary negligence," § 908 (like § 552B) gives no indication that any specific tort falls outside the realm of those for which punitive damages may be awarded. *Id.* § 908 cmt. b.

Our view is supported by Restatement § 549, which defines the damages available for *fraudulent* misrepresentation—an intentional tort for which Intertek concedes that punitive damages are available—and likewise makes no mention of punitive damages. Instead, that section authorizes a plaintiff to recover compensatory damages: "the

19

pecuniary loss to him of which the misrepresentation is a legal cause." *Id.* § 549. The fact that the fraudulent misrepresentation section of the Restatement also fails to mention punitive damages strongly suggests that § 552B's similar omission is of no import. Section 552B does not, as Intertek claims, foreclose punitive damages for negligent misrepresentation.

In addition to its § 552B argument, Intertek tries to distinguish *Hutchison* by arguing that unlike the plaintiff in that case, who sued an employer for negligent supervision and could not have sued for an intentional tort, Brand could have sued for intentional (that is, fraudulent) misrepresentation. It fails to explain, however, why this difference matters. The nonexistence of a related intentional tort claim is not a prerequisite to obtaining punitive damages pursuant to a negligence claim. Punitive damages may be awarded in Pennsylvania for reckless conduct, *Hutchison*, 870 A.2d at 770–72—that is, conduct less culpable than intentional or willful action. A plaintiff can sue for negligence and prove recklessness, yet still be unable to prove intent, as the *Hutchison* court implicitly acknowledged. This is true irrespective of the existence of a parallel intentional tort.

*Hutchison* announced a broad rule for punitive damages in the negligence context: "We see no reason . . . to distinguish between claims sounding under Section 317 [of the Restatement, the section setting forth the elements of the negligent supervision claim at issue in *Hutchison*] and other actions sounding in negligence for purposes of punitive

20

damages."[2] *Id.* at 773. Giving due regard to that opinion, we likewise refuse to conjure a strained distinction between Section 552 claims and all other negligence claims. We therefore hold that *Hutchison* generally permits a plaintiff to undertake the additional burden of proving the heightened culpability required to sustain a punitive damages claim in negligence suits—and in negligent misrepresentation cases specifically. "It may be that, as a practical matter, it proves more difficult to sustain a claim for punitive damages [in a negligence case] . . . . But, that is a matter for proof that attends the particular case . . . ." *Id.*

2

Intertek argues that even if punitive damages are available for negligent misrepresentation claims in Pennsylvania, the District Court's decision to instruct the jury on punitive damages was not rationally based on facts adduced at trial. Although in most situations we review the decision to give a jury instruction for abuse of discretion, *Eshelman v. Agere Sys., Inc.*, 554 F. 3d 426, 439 (3d Cir. 2009), our Court has chosen a different path when the jury instruction at issue is one regarding punitive damages, so

---

[2] The Pennsylvania Supreme Court decided *Hutchison* about two months after it decided *Bilt-Rite*, which opened the door to negligent misrepresentation cases in Pennsylvania. Given the cases' temporal proximity, if the *Hutchison* court didn't intend for its holding to apply broadly to all negligence actions—including those authorized just two months earlier by *Bilt-Rite*—it likely would have said so, perhaps by noting that the availability of punitive damages for negligence is a question that needs to be evaluated on a claim-by-claim basis. It made no such statement.

we review this decision de novo, *Alexander v. Riga*, 208 F.3d 419, 430 (3d Cir. 2000).

In Pennsylvania as elsewhere, "[t]he state of mind of the actor is vital" in determining whether punitive damages may be awarded. *Feld v. Merriam*, 485 A.2d 742, 748 (Pa. 1984). "Ordinary negligence . . . will not support an award of punitive damages. Rather, to justify an award of punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, *i.e.*, with evil motive or reckless indifference to the rights of others." *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983–84 (Pa. Super. Ct. 2005) (citation omitted). Brand does not contend that Intertek acted with evil motive, so the question is whether there was sufficient evidence in the record showing that Intertek acted with reckless indifference such that a punitive damages instruction was permissible.

It takes a special type of recklessness to justify punitive damages in Pennsylvania. "[A] punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison*, 870 A.2d at 772. That "conscious disregard" is critical: "[A]n appreciation of the risk is a necessary element of the mental state required for the imposition of [punitive] damages." *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 n.12 (Pa. 1985), *abrogated on other grounds by Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800 (Pa. 1989). For our Court to uphold the District Court's decision to instruct the jury on punitive damages, therefore, we must find evidence in the record that Intertek actually knew its conduct was placing Brand at risk of harm.

22

The District Court pointed to several pieces of evidence that, in its view, showed the recklessness that merited a punitive damages instruction. That evidence included: (1) Intertek's lack of experience testing to the specific ANSI standard applicable to the Thermablaster and its lack of disclosure about that inexperience; (2) Curkeet's testimony that he helped write ANSI Z.21.11.2b and knew how complicated it was, yet only loosely oversaw the China facility responsible for testing to it; (3) the language issues arising from the lack of translation at the China facility; (4) the testimony of a defense expert that the China facility had committed major errors in testing; and (5) Intertek's reference to an incorrect standard—one that regulates barbecue grills, not heaters—in the footer of a testing form.

Intertek's argument, reduced to its essence, is that the evidence simply did not show the subjective knowledge of risk that is required to support a punitive damages instruction in Pennsylvania. We disagree. Curkeet's testimony, in particular, allowed the jury to find not only that a reasonable person would have recognized the risk of harm to Brand caused by Intertek's misrepresentations, but also that Intertek was actually aware of that risk. As the man ultimately responsible for testing heating-related products, Curkeet knew that such products pose serious risks to consumers if they are faulty. He knew that manufacturers and consumers relied on Intertek's testing. Nevertheless, Intertek lacked a "complete process" to ensure that its facilities performed tests correctly and consistently. App. 802. Despite that deficiency, and although Curkeet knew that Intertek's operations would be improved if its facilities around the globe shared best practices with each other, Intertek took no steps to improve its procedures and thereby reduce risk.

23

The evidence related to language-barrier issues provided further support for a punitive damages instruction. Although it was "obvious" that Intertek's Chinese engineers had problems with English, App. 800, the company chose not to provide translations of complicated, technical safety standards to them, despite the fact that those engineers were directly responsible for ensuring that the standards were met.[3] The risks inherent in that decision came to fruition when "something got lost in translation" in the Thermablaster testing. App. 802. And this wasn't a one-time issue—Curkeet acknowledged that engineers had been caught slacking off and failing to fully test products in the past.

Curkeet's testimony about his experience drafting the ANSI standard is further evidence of subjective recklessness. He knew that the applicable standard was new and that Intertek had not yet tested to it. Moreover, because he was on the drafting committee, he had firsthand knowledge of the standard. Yet he chose not to supervise the China facility and did not instruct them to call him immediately if any problems arose. The resulting harm to Brand was avoidable; had Curkeet more closely supervised the China facility, he testified, the testing problems would not have occurred.

To summarize, Intertek knew that its testing was critical to the economic welfare of manufacturers and the

---

[3] Intertek argues that it didn't translate the standards because doing so can result in "lost jargon." Intertek Br. 41. But that argument is counterproductive: the fact that Intertek consciously chose not to provide translations shows that Intertek had subjective awareness of Brand's (and other customers') risk of harm as a result of the language issues. It recognized that risk and proceeded in spite of it.

24

health of consumers. It knew that its testing process had holes, and it knew that problems had arisen in the past as a result. It knew that it had not yet tested to ANSI Z.21.11.2b, a standard Curkeet helped author. And it knew that its Chinese engineers might have difficulties understanding the standard because it was written in English. In the face of these compounding risks, Intertek chose to proceed without instituting additional precautions or process redesigns. In other words, the company subjectively knew of, and consciously disregarded, a risk of harm to Brand.

The District Court stated in its post-trial opinion that "Intertek admitted during trial that it knew or had reason to know of the high degree of risk" its actions led to. *Brand Mktg. Grp.*, 2014 WL 2094297, at *14. As Intertek correctly points out, having reason to know of a risk is not enough, under Pennsylvania law, to support a punitive damages award. "Instead, [Pennsylvania] requires the more culpable mental state of conscious indifference to another's safety . . . . There must be some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it." *Burke v. Maassen*, 904 F.2d 178, 182 (3d Cir. 1990) (citing *Martin*, 494 A.2d at 1097). We find the District Court's misstatement in this regard harmless. An error is harmless "if it is highly probable that [it] did not affect the outcome of the case." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 917 (3d Cir. 1985). Here, the District Court's legal misstatement almost certainly had no effect on the outcome of the case—Curkeet's testimony, in particular, showed that Intertek was *actually* aware that inadequate testing placed Brand at a risk of harm and that it consciously chose not to mitigate that risk.

Intertek also criticizes the District Court's characterizations of certain facts. But to the extent that the Court mischaracterized relevant facts, those mischaracterizations also were harmless. For example, the District Court stated that Intertek "tested to wholly inapplicable safety standards," using a barbecue grill standard rather than the correct one. *Brand Mktg. Grp.*, 2014 WL 2094297, at *15. The record doesn't bear that characterization out—Curkeet's testimony, which was uncontradicted on this point, indicates that the China facility used an old document template and forgot to change the document's footer, but ultimately tested to the correct standard. And the District Court, in discussing testimony of Intertek's general counsel, stated that that testimony would have allowed a jury to find that "the goal of the business dealings between the parties (from [Intertek's] perspective) was to make it 'painful' and 'personally difficult' for [Brand]." *Id.* at *2. As Intertek points out, the witness never acknowledged that he had made any statement to that effect; in fact, he denied recalling any such conversation. Even if Intertek is correct that the District Court erred in discussing both facts, though, those errors were harmless given the numerous other pieces of evidence evincing Intertek's knowledge and disregard of risk that were presented at trial.

That evidence, while perhaps less than a smoking gun, provided a sufficient factual basis to support an instruction regarding punitive damages to the jury. The District Court did not err in giving that instruction.

3

Intertek's final challenge to the punitive damages award is a constitutional one. Even if the District Court

26

correctly interpreted the facts and Pennsylvania law as authorizing an instruction on punitive damages, Intertek argues, the jury's award violated the Fourteenth Amendment's Due Process Clause. In our "role as gatekeeper" we review de novo a District Court's decision upholding the punitive damages award. *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 189, 193 (3d Cir. 2007) (quoting *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 468 (3d Cir. 1999)). More particularly, we must determine "whether the punitive damage award is so 'grossly disproportional' to [Intertek's] conduct as to amount to a constitutional violation." *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 230 (3d Cir. 2005) (quoting *Cooper Indus.*, 532 U.S. at 434).

The Due Process Clause "prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (citing *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 454 (1993)). The Supreme Court has established three guideposts to determine whether a punitive damages award was grossly excessive: (1) the degree of reprehensibility of the defendant's actions; (2) the disparity between the harm or potential harm suffered by the plaintiff and its punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 574–75. The District Court did not, and we will not, address the third consideration, as it would be unhelpful because there are not comparable cases with civil penalties for negligent misrepresentation. *See CGB Occupational*, 499 F.3d at 189–90 (noting that the third subfactor was "not instructive here" and declining to address it); *Inter Med. Supplies*, 181 F.3d at

27

468 (finding the third guidepost "unhelpful" in evaluating punitive damages for tortious interference and related common law torts). We therefore focus on the first two factors: the reprehensibility of Intertek's conduct and the disparity between the compensatory and punitive damages awards.

The reprehensibility of Intertek's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. Because it's so important to this analysis, the Supreme Court has provided further detail on this guidepost, instructing courts to consider the extent to which the following subfactors are satisfied:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*CGB Occupational*, 499 F.3d at 190 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). We also have indicated that a plaintiff's improper conduct may be relevant. *See Inter Med. Supplies*, 181 F.3d at 467 (noting that the fact that the plaintiff had breached contracts and engaged in tortious acts was "[a]nother factor that tends to mitigate the need for a high punitive damages award").

The District Court found that the first subfactor weighed in favor of Intertek; the second, third, and fourth

28

subfactors weighed in favor of Brand; and the fifth subfactor had a neutral effect. Intertek argues that all five subfactors, plus Brand's purportedly wrongful conduct, favor it. Most of Intertek's arguments amount to quibbles with the District Court's factual determinations, which we cannot disturb unless they are clearly erroneous. *CGB Occupational*, 499 F.3d at 189. In that vein, it argues that the District Court erred by concluding that (1) Intertek acted recklessly (subfactor two); (2) Brand was financially vulnerable (subfactor three); and (3) Intertek repeatedly performed sloppy testing work (subfactor four).

Our review of the trial record leads us to conclude that none of these factual determinations was clearly erroneous. There was evidence that Intertek acted recklessly—including, especially, Curkeet's testimony. *See supra* Part III.C.2. The District Court supported its finding of financial vulnerability by noting that neither David Brand nor his company could pay the Ace judgment because the company was so reliant on the Ace contract that the deal's collapse left Brand teetering on the edge of financial ruin. *Brand Mktg. Grp.*, 2014 WL 2094297, at \*18. And the District Court's finding of repeated misconduct was supported by Curkeet's testimony, which included statements about Intertek's incomplete testing process and previous breakdowns. *See supra* Part I.B. We therefore reject Intertek's fact-based arguments regarding reprehensibility.

In addition to its factual claims, Intertek makes a legal argument with respect to the second subfactor. The District Court found that Intertek's actions showed reckless disregard of Brand's rights and consumers' health and safety, as faulty testing of malfunctioning heaters could place consumers in serious danger. Intertek argues that the District Court erred in

considering potential harms to consumers rather than harm to Brand alone. That consideration, it argues, ran afoul of the Supreme Court's admonition that punitive damage awards not be used "to punish and deter conduct that [bears] no relation to [the plaintiff's] harm." *State Farm*, 538 U.S. at 422.

This issue—whether courts may consider harm to the public, rather than harm to the plaintiff only—is not settled by precedent. *State Farm* provides the most pertinent Supreme Court pronouncement on the issue. In that case, a Utah jury awarded a plaintiff $145 million in punitive damages (against $1 million in compensatory damages) in a suit against State Farm for fraud, bad faith, and intentional infliction of emotional distress. *Id.* at 412–14. After the trial court reduced the punitive award to $25 million, the Utah Supreme Court reinstated the $145 million award pursuant to its application of *Gore*'s three-pronged analysis. *Id.* at 415.

In reinstating the award, the Utah Court relied "in large part" on evidence of State Farm's corporate policy of denying or capping insurance claims to meet fiscal goals, even though doing so was not in their customers' best interests and was sometimes fraudulent. *Id.* at 415–16. "Evidence pertaining to [this policy] concerned State Farm's business practices for over 20 years in numerous States. Most of these practices bore no relation to . . . the type of claim underlying the [plaintiffs'] complaint against the company." *Id.* at 415. The Supreme Court reversed, applying the *Gore* factors and holding that the punitive damages award was "an irrational and arbitrary deprivation" of State Farm's property. *Id.* at 429.

The Supreme Court held that the Utah Supreme Court should not have "condemned [State Farm] for its nationwide

policies rather than for the conduct directed toward the [plaintiffs]." *Id.* at 420. Those policies, while unsavory, were dissimilar to the conduct at issue and occurred in states outside Utah, where the conduct may not have been illegal. *Id.* at 420–21. Federalism principles, the Court noted, counseled against allowing Utah to penalize out-of-state conduct that other states permitted—"each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *Id.* at 422.

As important as federalism was to the Supreme Court's decision, it stated that the punitive damages award was constitutionally improper "[f]or a more fundamental reason . . . : The [Utah] courts awarded punitive damages to punish and deter conduct that bore no relation to the [plaintiffs'] harm. A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *Id.* The Due Process Clause, the Court stated, "does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis." *Id.* at 423.

*State Farm* thus shows that, although courts may consider other instances of misconduct by the defendant in evaluating a punitive damages award, that conduct must be "of the [same] sort" as the conduct that injured the plaintiff. *Id.* Intertek argues that, by considering harm to the public rather than harm to Brand alone, the District Court violated this mandate, especially because "no one—and certainly not Brand or his company—was physically injured from Brand's products." Intertek Br. 54.

31

Intertek overreads *State Farm*. That decision does not prohibit the consideration of potential public harm in addition to the plaintiff's injury. It prohibits only the consideration of conduct that is unrelated to the plaintiff's case. Unlike the companywide policies in *State Farm*—which spanned two decades, many states, and a wide variety of actual conduct—Intertek's actions in this case involved one series of incidents: its negligent communications to Brand about the Thermablaster testing. The District Court didn't consider, for example, testing errors that occurred at different Intertek facilities and involved different products over the course of many years—something that would have run afoul of *State Farm*—but instead focused only on the misconduct related directly to this case. The fact that the harm may have expanded beyond Brand's own harm doesn't matter because the District Court correctly focused only on the conduct at issue without considering "independent" harms.[4]

Moreover, unlike the widespread public harm considered in *State Farm* (which had no conceivable connection to the plaintiffs in that case other than the fact that State Farm inflicted it), the potential public harm here is directly tied to Brand. As the creator and seller of the heaters, Brand surely would have been sued by any person injured by a Thermablaster. The company would have been vulnerable

---

[4] The fact that no one was physically injured by the Thermablasters is unimportant. What matters is that Intertek acted in reckless disregard of the risk of harm; that the risk did not come to fruition is a product of chance for which Intertek should not be rewarded. And the District Court's determination that there was evidence of recklessness vis-à-vis public safety was not clearly erroneous. *See supra* Part III.C.2.

to dozens of lawsuits and perhaps millions of dollars in liability if the heaters in fact caused harm to the public. Thus, potential harm to the public *was necessarily potential harm to Brand*, and Intertek does not dispute that harm to Brand should be considered in this analysis.

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Gore*, 517 U.S. at 568. The District Court's consideration of potential public harms—which were integrally related to Brand's harm—furthered that interest. *State Farm* instructs that a court may not search far and wide for unrelated instances of wrongful conduct by a defendant. But neither should a court wear blinders in conducting a due process analysis, remaining purposely oblivious to all harmful effects of a defendant's conduct that do not directly befall the plaintiff, even when those harms arise from the precise conduct at issue.

In sum, because the potential harm to the public in this case did not arise from the "defendant's dissimilar acts, independent from the acts upon which liability was premised," we hold that the District Court did not err in considering it. *State Farm*, 538 U.S. at 422.

As for the disparity between the compensatory and punitive awards, Intertek calculates the ratio between the two based on the compensatory award it thinks should have been given: $320,368. If that were the compensatory award, the punitive-to-compensatory ratio would have been greater than 15:1. But the actual compensatory damages award we upheld ($1,045,000) yields a ratio of less than 5:1. Although the Supreme Court has repeatedly "decline[d] . . . to impose a bright-line ratio" for due process purposes, "[s]ingle-digit

33

multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with [significantly higher ratios]." *Id.* at 425. In light of our analysis of the reprehensibility guidepost, a 5:1 ratio is not the type of gross disparity between compensatory and punitive damages that renders a punitive award suspect by itself.

Thus, both analytical guideposts indicate that the punitive damages award in this case did not violate due process. We will affirm the District Court's decision regarding punitive damages.

D

Intertek's final argument is that a new trial is warranted because the jury's verdicts—on Brand's claim for negligent misrepresentation and Intertek's counterclaim for trademark infringement—were inconsistent. It argues that the jury could not rationally have concluded both that Intertek's misrepresentations caused Brand's injury and that Brand infringed on Intertek's trademark. "We review the district court's order ruling on a motion for a new trial for abuse of discretion unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993).

According to Intertek, Brand's infringement—which occurred when the company emblazoned the Thermablaster boxes with Intertek's seal of approval prior to receiving permission to do so—would have caused Brand the same injury it suffered even if Intertek had not committed any misrepresentation, so Brand's conduct was a legally

34

superseding cause of its own loss. As a result, it argues, the District Court's denial of Intertek's motion for a new trial was an abuse of discretion.

But Intertek does not explain how, if it had *not* negligently misrepresented that the Thermablasters met the ANSI standard, Brand's infringement would have caused the same injury Brand actually suffered. In a parallel universe where Intertek's Test Data Sheet correctly indicated that the heaters did not comply with the standard, David Brand testified that he would have sought to rectify the problem. Brand therefore would not have provided Ace with faulty heaters, and Ace would have had no reason to demand its money back and eventually obtain a judgment against Brand. Although Brand would have incurred some incremental costs, it would not have suffered the same injury even if it still infringed on Intertek's mark. Instead, it would have committed trademark infringement and possibly owed some damages to Intertek, but it would not have lost its Ace-related profits.

It is possible that, in that parallel universe, Brand would have ignored Intertek's warnings that the Thermablasters did not meet the safety standard and would have proceeded to sell them to Ace anyway (while still using Intertek's certification mark without permission). Brand might then have suffered the same injury even absent Intertek's misrepresentation. But it's not for us to give credence to such a hypothetical version of events, "[f]or a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962). Rather, we must affirm the District Court unless there is no possible way

35

to reconcile the jury's verdicts. *See id.*; *cf. Gallick v. Balt. & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963) ("[I]t is the duty of the courts to attempt to harmonize the answers [to special interrogatories], if it is possible under a fair reading of them . . . ."). The District Court did not abuse its discretion.

## IV

For the reasons stated, we will affirm the order of the District Court denying Intertek's post-trial motion.

FISHER, *Circuit Judge*, dissenting in part.

I join all but Sections III-C-2 and III-C-3 of the opinion of the Court. I part ways with the majority on the question of the sufficiency of the evidence to support the punitive damages jury instruction. I believe the majority misapplies the standard for punitive damages under Pennsylvania law and, in so doing, unduly waters down the necessary showing to support a punitive award.

Punitive damages are an "extreme remedy." *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1098 n.14 (Pa. 1985) (plurality opinion), *abrogated on other grounds by Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800 (Pa. 1989). They "are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton[,] or reckless conduct." *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005). As noted correctly by the majority, for reckless conduct to support a punitive award, the plaintiff must show "that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act . . . in conscious disregard of that risk." *Id.* at 772. Grossly negligent conduct is insufficient. *Martin*, 494 A.2d at 1098. So, as stated by the majority, to affirm the District Court's decision to instruct the jury on punitive damages, "we must find evidence in the record that Intertek actually knew its conduct was placing Brand at risk of harm." Maj. Op. 24.

Put simply, I believe the evidence in this case does not justify a punitive damages award. Like the majority, I believe Frederick Curkeet's testimony is vital. I agree further that Curkeet's testimony shows that Intertek understood its important role of preventing unsafe products from reaching the marketplace and that companies and consumers alike relied on Intertek to perform this role properly. But Intertek's

1

knowledge of this general risk of harm is not enough; the evidence must show that Intertek knew its specific conduct in this case placed Brand at risk of harm. *See generally Martin*, 494 A.2d at 1099–1100 (holding that knowledge of general safety risks posed by asbestos was not enough to show subjective appreciation of the specific risks faced by insulation workers installing asbestos). I also acknowledge that Curkeet testified to instances where Intertek engineers had made "pretty major mistakes" and "slack[ed] off on the job and sa[id] things complied without running the test," App. 841–42, but I note the absence of any specifics regarding the nature and circumstances of these mistakes. The majority attempts to fill this absence, but I think it requires us to reverse.

The majority overstates much of Curkeet's testimony. First, the majority relies on Curkeet's admission that Intertek did not always have "best practice documents," i.e., one set of forms used by every Intertek lab that spelled out specifically how to run a particular safety test, and instead sometimes relied on labs to create their own forms locally for a specific test. App. 802. This testimony may show that Intertek knew that it was not perfect (what company is?) and had room to improve (what company doesn't?), but it does not show that Intertek knew that relying on labs in some cases to create their own forms placed Brand at risk of harm. The majority speculates that "problems had arisen in the past as a result" of these "testing process . . . holes," Maj. Op. 26, but Curkeet never testified that the lack of standard forms had ever caused the kinds of mistakes that occurred in this case. The lack of rigorous uniformity does not equate to recklessness, and if an admission of imperfection or lack of absolute uniformity opens the door to punitive damages whenever something goes

2

wrong, Pennsylvania companies may be in for a rude awakening.

Nor do I agree with the majority that the punitive damages instruction is supported by Intertek's decision to test the Thermablasters in China using standards written in English. The majority relies on Curkeet's admission that Intertek's Chinese engineers had "'obvious'" problems with the English language. Maj. Op. 25. What Curkeet actually said, however, was far more innocent. He said that Intertek's Chinese engineers "are essentially trained in engineering in English for the most part"; that "their knowledge of English, written English and technical English[,] is actually very good"; and that "they certainly have the training to deal with [the] English language in engineering functions," though they may not write English as easily as native speakers. App. 800–01. As for the decision not to translate the standards into Chinese, Curkeet explained that Intertek decided it was better for Chinese engineers to work with English standards based on its assessment that the "specific terminology" in the English safety standards would not "translate to Chinese . . . very well." App. 801. He also said that, in his experience, the Chinese engineers "have been very able" to deal with English safety standards. *Id.* So although Curkeet admitted it was "obvious" that English was not the Chinese engineers' first language, nothing in his testimony suggests that Intertek knew that it placed Brand at risk of harm by having Chinese engineers apply English standards.

The majority finds additional evidence of Intertek's reckless conduct because, according to the majority, this was not a "one-time issue" given Curkeet's testimony about engineers slacking off and failing to correctly run tests. Maj. Op. 25. But again, Curkeet never said what these past mistakes entailed and certainly never said they involved

3

translation issues, so these prior bad experiences do not show that Intertek subjectively appreciated a risk of harm created by any translation issues here. Additionally, in rejecting Intertek's argument that it chose not to translate the safety standards from English to Chinese to avoid "'lost jargon,'" the majority concludes that Intertek's choice actually shows that Intertek subjectively appreciated the risk of harm to Brand from any language issues. Maj. Op. 25 n.4. I disagree. If anything, it shows that Intertek decided a risk existed (perhaps incorrectly) and avoided it, not the other way around. I therefore fail to see where the evidence is that Intertek knew that it placed Brand at risk of harm by having Chinese engineers interpret English standards.

Finally, the majority finds support for the punitive damages instruction in Curkeet's acknowledgment that the safety standard at issue was new and complex, yet the testing proceeded without Curkeet's direct supervision or instructions. I might agree with the majority if Curkeet testified that he knew at the time that he needed to instruct the engineers to seek his personal help to interpret this standard or that Intertek had any prior bad experiences testing to new safety standards. But Curkeet only said he would do things differently in retrospect and never mentioned any prior bad experiences with new standards, instead noting that Intertek "regularly" worked with new standards. App. 855.

In sum, Brand pursued a negligence claim and presented sufficient evidence to support that claim. Although Pennsylvania law permitted Brand to go the extra mile by proving not just negligence but outrageous conduct to support

4

a punitive damages award, *see Hutchison*, 870 A.2d at 772, I simply believe Brand came up short.[1]

I respectfully dissent.

---

[1] Because I conclude that the evidence was insufficient for the District Court to instruct the jury on punitive damages, I would not reach Intertek's constitutional challenge to the punitive damages award.