# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3128
_____

Angela Marie Lee, By next friend Renee B. Lee

*Plaintiff - Appellee*

v.

Albert Lee Borders, Individually and in his official capacity

*Defendant - Appellant*

St. Charles Habilitation Center; Missouri Department of Mental Health

*Defendant*s
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 14, 2014
Filed: August 25, 2014
_____

Before LOKEN, MURPHY, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Angela Marie Lee sued Albert Lee Borders in state court for battery and, pursuant to 42 U.S.C. § 1983, for deprivation of her substantive due process right to bodily integrity; she also brought suit against the St. Charles Habilitation Center and

the Missouri Department of Mental Health, who removed the case to federal court and were subsequently dismissed from the case. After a three-day trial, the jury returned a verdict against Borders on both counts and awarded Lee $1 million in compensatory damages and $3 million in punitive damages. Borders then moved for judgment as a matter of law or, in the alternative, a new trial. The district court[1] denied his motion, and he appeals. We affirm.[2]

## I. Background

In November 2007, Lee was a resident of the St. Charles Habilitation Center (St. Charles or Habilitation Center), a facility run by the Missouri Department of Mental Health for developmentally disabled individuals. At age twenty-two, Lee had lived in an institutional setting for several years due to mental illness, and she had a legal guardian to make decisions for her. Nonetheless, she was doing well at St. Charles in 2007, and her family was working with St. Charles staff to prepare her to move into an independent living facility. Borders, who began working in the St. Charles kitchen in March 2006, testified that Lee seemed to function well in that environment and was friendly when she saw him on the Habilitation Center grounds.

On November 20, 2007, Lee went to the St. Charles kitchen and asked Borders if her friend Sheila Rice, another St. Charles employee, was available. Borders, the only kitchen employee on duty at the time, answered that Sheila was not present. The parties' accounts of what followed differ sharply. Borders said Lee followed him to the storage area of the kitchen, where they had consensual anal intercourse.

---

[1]The Honorable Terry I. Adelman, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

[2]We exercise appellate jurisdiction under 28 U.S.C. § 1291.

According to Borders, "[S]he didn't yell rape or none of the other things as we were having sex."

Lee's claims against Borders for battery and for the deprivation of her right to substantive due process were tried before a jury on April 9–11, 2012. Lee did not testify at the trial. However, the nurse who saw Lee at the hospital and took a sexual assault report immediately following the incident testified from her notes:

> [Lee] stated that [Borders] would not let her out of the dietary kitchen door. . . . She tried to struggle with him. . . . He dragged her by her hand to the back where the canned food is kept. He asked [Lee] if [she] wanted to do it, and she stated to me, "I said no." She said—this is her words—"pushed me to the canned food and turned me around, and I got scared."

In addition, Lee's counselor at St. Charles indicated he would describe her as "vulnerable to someone taking advantage of her for things including sexual contact," and "she would not really be able to appreciate or understand what it means to consent to engage in sexual contact."

For several months after the incident, Lee received sexual trauma counseling from a private social worker, as well as weekly group therapy at St. Charles. Lee's counselor at St. Charles testified that her behavioral problems predated the assault and increased thereafter; she would, for instance, leave the areas where she was allowed to be (termed "elopement"). He also noted an increase in Lee's threats to harm herself in March and April, 2008, and a marked increase in elopement issues in September 2008. Her treatment team recommended in September 2008 that she be transferred to a far more restrictive environment at the Fulton State Hospital. The record does not detail the circumstances of her transfer, but the parties do not dispute that she moved to Fulton in November 2008. Lee's new social worker was not notified of the assault or apprised of her treatment history, so any trauma therapy ceased with her move.

At the close of Lee's case, and again when all evidence had been presented, Borders made an oral motion for judgment as a matter of law. He focused on whether Lee had introduced sufficient evidence for the jury to find, as she argued, that he was acting under color of state law at the time. The court denied his motion each time. The jury found against Borders on both claims and awarded Lee $1 million in compensatory damages and $3 million in punitive damages. Borders then renewed his motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, contending the jury's verdict against him had "no legally sufficient evidentiary basis" as Lee had not demonstrated he was acting under color of state law. In the alternative, he moved for a new trial pursuant to Fed. R. Civ. P. 59. The district court denied the motion, and Borders appeals both rulings.

## II. Discussion

### A. Motion for Judgment as a Matter of Law

Borders contends there was no legally sufficient evidentiary basis for a reasonable jury to conclude Lee had proven he was acting under color of state law, as required for her substantive due process claim. See Fed. R. Civ. P. 50(a)(1). We "review[] de novo a denial of a motion for judgment as a matter of law." Weitz Co. LLC v. MacKenzie House, LLC, 665 F.3d 970, 974 (8th Cir. 2012). "This court makes all reasonable inferences in favor of the nonmoving party and views the facts most favorably to that party." Id.

Sexual abuse by a state official may constitute a violation of the substantive due process right to bodily integrity, provided the state official was acting under color of state law at the time of the abuse. Rogers v. City of Little Rock, Ark., 152 F.3d 790, 795–96 (8th Cir. 1998). "'The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the

authority of state law.'" Roe v. Humke, 128 F.3d 1213, 1215–16 (8th Cir. 1997) (quoting West v. Atkins, 487 U.S. 42, 49 (1988)). "'[A] defendant . . . acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.'" Id. (quoting West, 487 U.S. at 49–50). "The element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." Johnson v. Phillips, 664 F.3d 232, 240 (8th Cir. 2011). We look to the "nature and circumstances of the [state employee's] conduct and the relationship of that conduct to the performance of his official duties." Roe, 128 F.3d at 1216 (quotation omitted).

Borders acknowledges that the sexual contact occurred in the St. Charles kitchen, but he testified he was not engaged in work-related duties at the time. He also argues there was no evidence Lee came to the kitchen seeking food, as part of his job was to dispense snack food and supplements. At trial, he testified that after he informed Lee that her friend, his co-worker, was not there, he asked Lee if "she want[ed] something, like her rice cakes, and she said no." However, she then followed him as he went toward the back of the kitchen, where these items were stored. Alternatively, there was evidence in the record that Borders dragged Lee to the restricted area of the kitchen, his employment giving him access both to the kitchen and to Lee. Borders was in charge of the kitchen at the time, so he controlled who entered it and remained there. "[R]easonable persons could differ as to the conclusion to be drawn from the evidence," EEOC v. Kohler Co., 335 F.3d 766, 772 (8th Cir. 2003), but even in Borders' version of events, Lee followed him after he had offered food that he had the authority to provide. Since Borders "largely reargues [his] version of the facts," and there was "sufficient evidence to reject [Borders'] position," Weitz, 665 F.3d at 977, we affirm the district court's denial of Borders' motion for judgment as a matter of law.

## B. Motion for a New Trial

Borders appeals the denial of his motion for a new trial based on an allegedly erroneous jury instruction and on excessive damages awards. We address each argument in turn.

## 1. Jury Instruction

Borders moved for a new trial arguing that the jury instruction on consent improperly permitted the jury to find him liable for negligent conduct—a lesser standard than is required for a substantive due process claim. "We review the jury instructions given by a district court for an abuse of discretion. Our review is limited to whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." Fuller v. Fiber Glass Sys., LP, 618 F.3d 858, 866–67 (8th Cir. 2010) (quotation omitted). "Reversal for a new trial is appropriate only if there was an error that affected a substantial right of the moving party." Swipies v. Kofka, 419 F.3d 709, 716 (8th Cir. 2005).

To return a verdict against Borders on Lee's substantive due process claim, Final Instruction No. 6 required the jury to find by a preponderance of the evidence, in relevant part, that (1) "defendant had anal intercourse with plaintiff without the consent of plaintiff," and (2) "defendant had anal intercourse with plaintiff knowing it was without her consent." Final Instruction No. 8 defined consent as follows: "Consent or lack of consent may be expressed or implied. Assent does not constitute consent if it is given by a person who lacks the mental capacity to authorize the conduct of sexual contact and such mental incapacity is manifest or known to the actor." Borders objected to the proposed Instruction No. 8, arguing that the meaning of consent did not "merit[] a definition" and, moreover, that the use of the word "manifest" sounded in negligence and "throws some confusion into it." Part of

Borders' defense was that Lee had consented to the sexual contact. Consequently, the district court found the consent instruction was necessary in this case to clarify the difference between assent and consent when mental incapacity to consent was at issue. In discussing the proposed consent instruction with the parties, the court defined the word manifest to mean "obvious, or known to the actor," such that the jury could not find against Borders based on a negligence theory. The court then overruled Borders' objection to the proposed instruction.

We find the court's consent instruction was proper, acknowledging that "[t]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328 (1986).[3] Borders' statement that "she didn't yell rape or none of the other things as we were having sex" demonstrated the need to clarify what may constitute consent, particularly when mental capacity is at issue. Moreover, to return a verdict against Borders on the substantive due process claim, the jury was explicitly required to find that he "had anal intercourse with plaintiff *knowing* it was without her consent" (emphasis added). The court did not abuse its discretion in providing Final Instruction No. 8 to define consent.

Even if jurors were confused by this instruction, Borders' substantial rights were not affected, as the evidence presented at trial was more than sufficient to show that Borders knew Lee had not consented to sexual contact. Borders testified, "[Lee]

---

[3]Borders also invokes two provisions of the Missouri Approved Jury Instructions for the proposition that he could have been held liable due to the jury instructions for negligent conduct, but these provisions are not directly applicable or persuasive. In addition, to the extent Borders' argument concerns Lee's state-law battery claim—for which recovery was barred if the jury found Lee consented "by words or conduct . . . to the acts of defendant and the reasonable consequences thereof"—we note that the language in the consent jury instruction is identical to Missouri's statutory definition of consent, modified only to specify that the conduct at issue was "sexual contact." See Mo. Rev. Stat. § 556.061(5) (2008).

wasn't just a regular patient like you normally see at St. Charles. [She] was [] highly functional. It's not like she had a disability." However, Lee's counselor at St. Charles testified that to live there, all residents had to meet a statutory definition of disability; Lee had been diagnosed with an intellectual disability, as well as several psychological conditions. Despite Borders' testimony that Lee consented, evidence at trial would support a jury finding that Borders dragged Lee to the back of the kitchen, and she tried to struggle with him. Borders also frequently changed his story, including at trial, and he acknowledged that he had twice claimed no sexual contact occurred at all. He did not explain the inconsistencies substantively; rather, he testified he was trying "[a]t the same time [to] protect myself, but at the same time keep my job, too." The jury was free to find his testimony lacked credibility. Moreover, he worked at a facility for developmentally disabled individuals, where sexual contact of any kind between employees and residents was strictly prohibited, and he knew Lee was a patient there. He did not need to know all of Lee's diagnoses or medications to know she likely lacked the capacity to consent. He also acknowledged that he told Lee not to tell anyone about the sexual contact, implying he was concerned about the consequences. The jury had enough evidence to properly find Borders liable for acting without Lee's consent.

## 2. Damages Awards

Borders also contends the district court abused its discretion in denying his motion for a new trial based on compensatory and punitive damages awards that were "excessive and a product of passion and prejudice." Dossett v. First State Bank, 399 F.3d 940, 946 (8th Cir. 2005). Lee requested $10 million compensatory and $20 million punitive damages; she was awarded $1 million and $3 million, respectively.

## a. Compensatory Damages Award

The court instructed the jurors regarding compensatory damages as follows:

If you find in favor of the plaintiff, then you must award the plaintiff compensatory damages in such sum as you find will fairly and justly compensate the plaintiff for any damages you find the plaintiff sustained as a direct result of the conduct of the defendant . . . . You should consider the following elements of damages:

The physical pain and mental suffering the plaintiff has experienced, the nature and extent of the injury, and whether the injury is temporary or permanent;

Remember, throughout your deliberations you must not engage in any speculation, guess, or conjecture and you must not award any damages under this Instruction by way of punishment or through sympathy.

Since the social worker who treated Lee after the assault discontinued her therapy for sexual trauma some eight months later, Borders contends Lee recovered quickly and suffered no financial losses. As such, he argues the compensatory damages award is excessive.

However, the record supports a jury finding that Lee suffered extensively from Borders' conduct and the ensuing move to Fulton. Borders elicited testimony from Lee's counselor at St. Charles that she was transferred to Fulton at least in part due to preexisting behavioral issues, but it was undisputed that such episodes increased in frequency and severity after November 2007. A forensic psychologist indicated that many of Lee's current behavioral problems—including those exhibited with increasing frequency several months after the assault—could be attributed to the post-traumatic stress disorder (PTSD) that he said resulted from "the sexual trauma she incurred." Although "prior to the incident, she was in a position of moving towards independence," the psychologist testified that at the time of trial Lee was "in

a very severe regressive state . . . as a direct result of the sexual trauma" at St. Charles and the restrictive treatment at Fulton. The psychologist described Lee's extensive medical needs, many of which were due to PTSD, and the therapies required to treat them for the foreseeable future. He testified it would "average between [$]12 and $15,000 a month" to meet her needs, which was the only quantitative evidence introduced. Lee's parents also described the profound changes they observed in their daughter and the differences between St. Charles and Fulton. When Lee lived at St. Charles, she had more flexibility to explore the grounds, to go home with her family on alternate weekends, and to go on field trips; at Fulton, her family saw her only in a visiting room. After her move to Fulton, Lee was put in mechanical restraints multiple times each month; she made several attempts to harm herself and was placed on suicide watch more than once. Lee's parents testified they had brought suit in part to be able to afford moving her from Fulton to a facility closer to their home.

Borders cites various cases where juries awarded less in compensatory damages to plaintiffs who he asserts sustained "injuries of the same level of seriousness or greater." However, these decisions, in their brevity, do not indicate the plaintiffs' ongoing medical, psychological, or other needs and the resulting costs. Without denigrating the trauma of the plaintiffs in these comparative cases, we find Lee's future needs are exceptional. Lee will require funds to support her in institutional facilities, and—as the forensic psychologist testified—her developmental disabilities likely exacerbated the trauma caused by Borders' actions. Moreover, "[t]his court has consistently held that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 763 (8th Cir. 2003) (quotation omitted). The district court did not abuse its discretion in finding the jury's compensatory damages award was sufficiently supported by the evidence presented.

**b. Punitive Damages Award**

Borders also argues the punitive damages award was excessive, as it greatly exceeds the awards given in other cases. The court instructed the jurors that, if they found "by the greater weight of the evidence" that Borders' conduct was "outrageous because of [his] evil motive or reckless indifference to the rights of others," then they could award punitive as well as compensatory damages. See Swipies, 419 F.3d at 717–18 (finding punitive damage awards appropriate in such circumstances). Borders' motive is a question of fact, and we accept factual findings made by the district court assessing whether a punitive damages award is excessive unless the findings are clearly erroneous. See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 435 (2001). However, we review de novo whether a fine is unconstitutionally excessive, id., asking whether an award "shock[s] the conscience or . . . demonstrate[s] passion or prejudice on the part of the trier of fact." Ondrisek v. Hoffman, 698 F.3d 1020, 1028 (8th Cir. 2012) (quotation omitted).

"'[G]rossly excessive' civil punishment" violates the Due Process Clause of the Fourteenth Amendment. Id. (quoting Cooper, 532 U.S. at 434). In assessing the constitutionality of a punitive damages award, we use the guideposts identified in BMW of North America, Inc. v. Gore, 517 U.S. 559, 574–85 (1996), which were incorporated into the district court's jury instructions. We weigh "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between actual or potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized in comparable cases." Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 602 (8th Cir. 2005) (citing Gore, 517 U.S. at 574–75).

We first evaluate the reprehensibility of Borders' conduct, which is "the most important guidepost." Ondrisek, 698 F.3d at 1028 (citing Gore, 517 U.S. at 575). To do so, we assess "whether the reprehensible nature of [his] conduct warrants further

damages to achieve punishment or deterrence of the conduct in the future." Id. (citing State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)). We must consider whether:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Campbell, 538 U.S. at 419 (citing Gore, 517 U.S. at 576–77). These factors demonstrate the reprehensibility of Borders' conduct.[4] Although Borders contends Lee "suffered minor injuries," the evidence presented at trial showed she experienced severe psychological harm. Borders' behavior, as revealed by his own testimony, demonstrated his reckless disregard of Lee's wellbeing. Borders' sexual misconduct occurred once, but he persistently sought to evade responsibility for it by instructing Lee not to report the assault immediately after it happened and providing varying factual accounts over the following weeks. Finally, we emphasize that Borders was an employee of a state-run institution for individuals with developmental disabilities, where sexual contact of any kind between employees and residents was expressly prohibited. As such, Borders abused a position of trust, which consequently increases the reprehensibility of his actions. See Ondrisek, 698 F.3d at 1029.

Next, we assess the ratio between Borders' compensatory and punitive damages awards. Borders contends this ratio demonstrates the punitive award was excessive. "The Supreme Court has 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.'" Ondrisek, 698 F.3d at 1029 (quoting Gore,

---

[4]As the harm to Lee was not economic, the third factor does not apply. See Ondrisek, 698 F.3d at 1029 n.2.

517 U.S. at 582). "But, 'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" Id. (quoting Campbell, 538 U.S. at 425). Borders' 3:1 ratio of punitive to compensatory damages does not yet reach the 4:1 ratio that the Supreme Court has "'concluded . . . might be close to the line of constitutional impropriety.'" Id. (quoting Campbell, 538 U.S. at 425). Particularly when it would be difficult for a jury to calculate Lee's future cost of care, and thus accurately gauge compensatory damages, a 3:1 ratio does not indicate unconstitutionally excessive punitive damages. Id.

Finally, we compare the damages award in this case to those in other cases. We acknowledge that this punitive damages award is far higher than others, but again, this case involves a particularly vulnerable victim who requires institutional care. A simple comparison to other cases is unhelpful in this context. Moreover, a monetary comparison with the damages awards from other cases—the focus of Borders' argument—is only one factor we use "to ensure proper notice of the penalty associated with [the defendant's] conduct." Id. at 1028 (citing Gore, 517 U.S. at 574–75). We find the punitive damages award against Borders is not unconstitutionally excessive.

## III. Conclusion

For the reasons above, we affirm the district court.

_____

-13-