# IN THE COURT OF APPEALS OF IOWA

No. 17-1100
Filed January 23, 2019

**JANICE and JEFF GRAY, Individually and as parents and next friends of J.G.,**
    Plaintiffs-Appellees,

**vs.**

**JAMES LEE HOHENSHELL,**
    Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.


        James Hohenshell appeals a district court order denying his motion for a new trial and upholding a jury's award of damages.  **AFFIRMED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

        Cory F. Gourley of Gourley, Rehkemper & Lindholm, PLC, West Des Moines, for appellees.

        Emily McCarty and Amy Beck of Fiedler & Timmer, P.L.L.C., Johnston, and Eashaan Vajpeyi of Ball, Kirk & Holm, P.C., Waterloo, for amicus curiae Iowa Association for Justice.


        Heard by Tabor, P.J., and Mullins and Bower, JJ.

**MULLINS, Judge.**

James Hohenshell appeals a district court order denying his motion for a new trial and upholding a jury award in the amount of $127 million in favor of plaintiffs, Janice and Jeff Gray, individually and as parents and next friends of their daughter, J.G. He argues the district court erred in denying his motion for a new trial or remittitur[1] because: (1) the verdict was influenced by passion or prejudice, (2) the compensatory damages award was not supported by the evidence, and (3) the punitive damages award was excessive and violates his due process rights.

## I.    Background Facts and Proceedings

The evidence presented at trial establishes the following facts by a preponderance of the evidence. J.G. was thirteen years of age and just about to start eighth grade at the time of the following events. On August 10, 2013, J.G. attended a going away party for a close friend, R.B., who is Hohenshell's stepdaughter. After arriving at the party, J.G. and several of her friends ate food, swam, hung out, and watched a scary movie. While the girls were watching the movie, Hohenshell and his wife, Rachel, were drinking alcohol. Rachel left the party after the girls finished watching their movie. After Rachel left, Hohenshell asked the girls if they wanted to drink alcohol, but he advised them, "You can't tell anyone." Hohenshell then provided the girls with vodka, whiskey, and beer. J.G. had never consumed alcohol before. J.G. and her friends consumed the alcohol. After the alcohol was introduced at the party, everyone watched television. While

---

[1] We note from the outset Hohenshell did not alternatively request a remittitur in his new trial motion.

J.G. was sitting on the couch next to Hohenshell, Hohenshell placed his hand on J.G.'s leg, upon which J.G. brushed it off and moved away from Hohenshell.

J.G. ultimately consumed too much alcohol and became intoxicated and sick. R.B. and another of J.G.'s friends accompanied J.G. to the bathroom, where she vomited. J.G.'s friends advised her she should go to bed. J.G. proceeded to a spare bedroom, where she vomited a second time. J.G. then went to lay on the couch while her friends cleaned up the mess. Hohenshell picked J.G. up off the couch, carried her upstairs to his bedroom, and placed her on his bed. R.B. and the second friend followed, and R.B. questioned Hohenshell if he was planning to sleep with J.G. R.B. then requested that Hohenshell place J.G. in her bedroom. Hohenshell responded, "No, she's fine," and told R.B. and the other friend to leave the room. They complied, and Hohenshell shut the door behind them. J.G. vomited a third time in Hohenshell's bedroom. Hohenshell then raped J.G. J.G. begged Hohenshell to stop, but Hohenshell refused to relent, shoving J.G.'s face into a pillow, directing her to be quiet, and telling her she was fine. The experience was painful for J.G. J.G. was a virgin prior to being raped by Hohenshell.

A week or so later, J.G. emotionally shared the foregoing events with one of her closest friends, S.L., who advised J.G. she needed to tell her parents or report it to someone else. J.G. then shared her experience with her former math teacher and a guidance counselor who, in turn, alerted the school principal and law enforcement. J.G.'s father, Jeff, was employed as a janitor at J.G.'s school at this time. The principal called Jeff into a meeting, at which time J.G. informed him of the sexual assault.

Prior to these events, J.G. was confident, happy, outgoing, laid back, trusting, and bubbly. She made friends easily and enjoyed participating in extracurricular activities. After her encounter with Hohenshell, J.G. became depressed, scared, reserved, and cautious; she lacked a desire to interact with new people; she saw herself as someone no one wants to be around; and her enthusiasm about extracurricular activities decreased. According to S.L.'s testimony, J.G. experiences pain and suffering and J.G. has not been the same person since she was raped. J.G.'s former math teacher also observed a significant difference in J.G.'s demeanor, even before J.G. shared her experience with her. Her choir teacher also noticed the change in demeanor, noting in her testimony that J.G. was "full of life" with "an aura of sunshine around her" but became a hollow version of herself after the sexual assault. The witnesses at trial consistently testified J.G. continues to suffer on a daily basis. Since the encounter, J.G. has experimented with self-harm and, specifically, has engaged in cutting herself. She has also considered committing suicide. J.G. lives in fear of Hohenshell, whose anticipated release date from prison was approximately one month after trial.

J.G. began attending therapy in 2013, at which time she was diagnosed with post-traumatic stress disorder. At the time of trial, J.G. had generally discontinued attending therapy. Her therapist testified J.G. was able to decrease the frequency of her therapy due to her commitment to therapy in its early stages. The therapist testified J.G.:

> will go through periods of time of being more stable emotionally, and then she will have things come up that will be triggering in terms of what she went through, and then we'll see an increase in symptoms,

and then we'll meet again for a while and work towards stabilization, and then we'll meet less frequently.

J.G. continues to experience triggering events, nightmares, and panic attacks; suffers from anxiety; and has difficulty learning. J.G.'s therapist testified the mental-health issues resulting from her sexual assault have not resolved and will be with her for the rest of her life, but she indicated J.G.'s therapy has made her better able to cope with those issues. The therapist testified she expects J.G. will experience several triggering events throughout her life: when she initiates her first romantic relationship, becomes sexually active, gets married, or has children or grandchildren. The therapist responded in the affirmative when asked whether she anticipated J.G. will suffer from her underlying mental-health issues for the rest of her life.

Prior to the foregoing events, J.G. and her parents were close. J.G.'s meaningful participation in her relationships with her parents waned after she was raped. J.G.'s therapist indicated in her testimony that this was a result of J.G.'s shame and her decreased ability to trust her parents or believe they can protect her from harm. J.G. now views all males, including her father, with contempt.

When asked why the plaintiffs initiated a civil lawsuit against Hohenshell, J.G. testified, "When someone takes everything away from you, they shouldn't get to have anything either." Her father added, "Her power was taken from her. I wanted her to gain some back." He also explained:

> I want to send a statement. I want this guy to pay. Two years and four months in jail is not payment to me—not even close—of what he's done to this little girl. . . . I want him to have nothing. . . . [H]e took everything from her. He should have nothing. I want . . . this to make the news. . . . [I]f just one person decides it's not worth doing this to a little girl, it would be worth all this.

In November 2014, Hohenshell pled guilty to one count of lascivious acts with a child and five counts of providing alcohol to a minor in connection with the foregoing events. At the guilty-plea proceeding, Hohenshell entered his plea with a smirk on his face and a chuckle.

In August 2015, plaintiffs filed a petition at law forwarding claims of: (1) assault, sexual assault, and battery; (2) intentional infliction of emotional distress; (3) negligent infliction of severe emotional distress; (4) negligent supervision; and (5) loss of services and consortium. In September 2016, plaintiffs moved for partial summary judgment with respect to liability on the assault-and-battery and intentional-infliction-of-emotional-distress causes of action, arguing Hohenshell's criminal convictions establish civil liability as a matter of law. Hohenshell did not file a resistance, even after the district court allowed him additional time beyond the deadline to file the same. The court granted plaintiffs' motion for summary judgment as to liability on the assault-and-battery claim but denied the motion as to the intentional-infliction-of-emotional-distress claim. Thereafter, Hohenshell, in responding to interrogatories, related that he did not dispute liability as to any of the claims but would only be disputing damages. Consequently, plaintiffs moved for summary judgment as to liability on all remaining claims. Hohenshell did not resist, and the court granted the motion.

A jury trial was held in February 2017. During summation and closing arguments, plaintiffs' counsel spoke of how Hohenshell "took everything from" J.G., including her personality, her safety and trust, her childhood, and her virginity. He also argued Hohenshell stole J.G. from her parents. He reviewed the various

harms to J.G.: the pain and suffering; loss of full function of mind and body, both past and during her future life expectancy of 64.17 years; and future life events that would trigger recurrence of pain. He asked the jury to award $30 million in compensatory damages for J.G.'s past and future loss of full mind and body and her physical and mental pain and suffering. He suggested that if Hohenshell's attorney were to argue the damages should be $5 million, perhaps the jury "should meet somewhere in the middle." He also told the jury they could go higher or lower than his request. For the parents' loss-of-consortium claims, he suggested $5 million be awarded to each parent. He argued Hohenshell's conduct in this case was not simply outrageous willful and wanton disregard for J.G., but it was a purposeful and deliberate attack on her. He then suggested that punitive damages could be between two and four times the compensatory damages, and that if punitive damages were too high in comparison to the compensatory damages award, they might violate due process.

Counsel for Hohenshell acknowledged J.G. was the victim of a crime. He spoke of the criminal punishment his client has faced and the hardships he will face in the future. Counsel's only reference to any particular damage amounts was in relation to the type of evidence that would be expected for damages of $30, $50, or $100 million. "It would have to be amazing, unbelievable, incredible evidence that showed damage that could never, ever be repaired." He then pointed to a lack of evidence concerning medical records or medical bills and objective psychological, psychiatric, or neurological analysis. He acknowledged the therapist's testimony, but he focused on J.G.'s current stability and how well she is coping. He made no suggestion as to any appropriate damages award

amounts, but with regard to punitive damages, he noted "our criminal court had handled that adequately."

The jury awarded compensatory damages to J.G. in the amount of $50 million, $1 million in loss-of-consortium damages to each parent, and punitive damages of $75 million allocated as follows:

| | |
|---|---|
| Past loss of mind and body (J.G.): | $15,000,000 |
| Future loss of mind and body (J.G.): | $10,000,000 |
| Past physical and mental pain and suffering (J.G): | $15,000,000 |
| Future physical and mental pain and suffering (J.G): | $10,000,000 |
| Past loss of consortium (Janice): | $750,000 |
| Future loss of consortium (Janice): | $250,000 |
| Past loss of consortium (Jeff): | $750,000 |
| Future loss of consortium (Jeff): | $250,000 |
| **Total compensatory damages:** | $52,000,000 |
| Punitive damages: | $75,000,000 |
| **Total damages:** | **$127,000,000** |

The next day, the district court entered judgment in the foregoing amount against Hohenshell. Thereafter, Hohenshell filed a motion for a new trial, contending: (1) the plaintiffs failed to present medical evidence to quantify the extent and nature of their damages, (2) the evidence was insufficient to support the jury's award concerning J.G.'s future loss of mind and body and her future physical and mental pain and suffering, and (3) "the total damages award . . . of $127 million is flagrantly excessive and raises a presumption that it is the product of passion or prejudice." The plaintiffs resisted. At a subsequent hearing, Hohenshell argued the evidence was insufficient to support the jury's awards of future damages and the verdict was a result of passion or prejudice. Apparently as a result of

Hohenshell's vague contentions in his motion and oral argument,[2] the court questioned whether he was challenging the verdict as a whole or specific items of damages. Hohenshell responded, "I am arguing specific elements, both the future damages for loss of consortium, the future damages for the pain and suffering, and loss of mind and body of J.G." Hohenshell specified, because the evidence was lacking to support those items of damages, the jury's awards on those items of damages must have been the product of passion or prejudice. Hohenshell went on to argue that the awards on those items are just examples of passion or prejudice and "the totality of this award is so excessive that it is clear that the jury acted out of passion or prejudice."

In its subsequent ruling, the court identified its understanding of the issues presented: "(1) whether there was insufficient evidence to support certain specific awards of damages; and (2) whether the verdict as a whole was the product of passion or prejudice." First, the court concluded the challenged awards were for noneconomic damages and the evidence was sufficient to support them. Second, the court concluded the jury's award of damages was not the result of passion or prejudice. Hohenshell appeals the order denying his motion for a new trial.

## II. Standard of Review

"We review the district court's denial of a motion for a new trial based on the claim a jury awarded excessive damages for an abuse of discretion." *WSH Props., L.L.C. v. Daniels*, 761 N.W.2d 45, 49 (Iowa 2008) (quoting *Estate of Pearson ex*

---

[2] Hohenshell additionally filed a brief in support of his motion prior to the hearing. In its ruling on the motion, the court declined to consider the brief, apparently because it was not timely filed.

*rel. Latta v. Interstate Power & Light Co.*, 700 N.W.2d 333, 345 (Iowa 2005)). "An abuse of discretion occurs when the court's decision is based on a ground or reason that is clearly untenable or when the court's discretion is exercised to a clearly unreasonable degree." *Id.* (quoting *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 160 (Iowa 2004)). Appellate review for excessiveness of a punitive damages award on due-process grounds is de novo. *See Wolf v. Wolf*, 690 N.W.2d 887, 894 (Iowa 2005).

## III. Excessiveness of Verdict

Hohenshell argues the district court erred in declining to grant a new trial on the ground that the jury's verdict is a product of passion or prejudice. He alternatively argues the court should have reduced the award of damages because it was not supported by the evidence before the jury. If a verdict results from passion or prejudice, a new trial should be granted, but if it is "merely excessive because not supported by sufficient evidence even in the absence of passion and prejudice justice may be effectuated by ordering a remittitur of the excess as a condition for avoiding a new trial." *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 659 (Iowa 1969).

### A. Passion or Prejudice

#### 1. *Presumption of Passion or Prejudice.*

Hohenshell argues a new trial is warranted because the award of damages is excessive and appears to have been influenced by passion or prejudice. *See* Iowa R. Civ. P. 1.1004(4). Hohenshell contends the size of the verdict, alone, creates a presumption that it is the product of passion or prejudice. We agree with Hohenshell "that a flagrantly excessive verdict raises a presumption that it is the

product of passion or prejudice" and if a verdict is the result of passion or prejudice, a new trial should be granted. *Daniels*, 761 N.W.2d at 49–50. Without a presumption of prejudice, the supreme court requires that passion or prejudice on the part of the jury be affirmatively established by the record. *See Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 771 (Iowa 2009) ("Without such a presumption, passion or prejudice must be found from evidence appearing in the record."); *Daniels*, 761 N.W.2d at 51 ("Once the presumption of passion that might arise from a flagrantly excessive verdict is dispelled, we must look for some other indication in the proceedings that would support a finding the jury was angry with the defendants and motivated to punish them.").

In considering whether a verdict is so excessive as to raise a presumption of passion or prejudice on the part of the jury, we examine the record, viewing the evidence in the light most favorable to plaintiffs that it will reasonably bear and giving weight to the fact the trial court, with the benefit of seeing and hearing the evidence, observing the jury, and having before it all incidents of the trial, did not see fit to interfere. *See Daniels*, 761 N.W.2d at 50; *Schmitt*, 170 N.W.2d at 660.

Hohenshell conceded liability on a number of civil claims: (1) assault, sexual assault, and battery; (2) intentional infliction of emotional distress; (3) negligent infliction of severe emotional distress; (4) negligent supervision; and (5) two claims of loss of consortium. The evidence shows prior to being sexually assaulted J.G. was confident, happy, outgoing, laid back, trusting, and bubbly. She made friends easily and enjoyed participating in extracurricular activities. After her encounter with Hohenshell, J.G. became depressed, scared, reserved, and cautious; she lacked a desire to interact with new people; she saw herself as someone no one

wants to be around; and her enthusiasm about extracurricular activities decreased. She has not been the same person, the way her mind operates has been altered, and she continues to experience pain and suffering on a daily basis. Her experience has led her to experiment with self-harm. She lives in fear. J.G. initially participated in therapy, but she has been able to decrease the frequency of her therapy due to her commitment to therapy in its early stages. J.G. continues to experience triggering events, nightmares, and panic attacks; suffers from anxiety; and has difficulty learning. J.G.'s therapist testified the mental-health issues resulting from her sexual-assault have not been resolved and will be with her for the rest of her life, but she indicated J.G.'s therapy has made her better able to cope with those issues. The therapist testified she expects J.G. will experience several triggering events throughout her life: when she initiates her first romantic relationship, becomes sexually active, gets married, or has children or grandchildren. The therapist responded in the affirmative when asked whether she anticipated J.G. will suffer from her underlying mental-health issues for the rest of her life. $1 million was awarded for each parent's loss-of-consortium claims. J.G. and her parents were close prior to her sexual assault, but her meaningful participation in the relationships with her parents decreased thereafter, especially as to her father. The punitive damages award tacked on another $75 million.

The question is whether, viewing the evidence in the light most favorable to plaintiffs, the award was flagrantly excessive based on the evidence presented and, as such, there is a presumption of passion or prejudice, thus warranting a new trial.

Certainly, we acknowledge the total damages awarded are substantial. During closing arguments, plaintiffs' counsel argued that if jurors thought the damages requests were not reasonable, perhaps they should compare the reasonableness of Hohenshell's conduct toward J.G. Counsel also called the jury's attention to huge verdicts in Florida, New York, or California, and specifically referenced the "hot coffee"[3] case. On our review of plaintiffs' closing argument, the focus was on how the parties were damaged and not on attempts to engender resentment or anger. When arguing for punitive damages, the emphasis was on punishment for Hohenshell's outrageous conduct—a theory of liability he had admitted—not based in resentment or anger. Our duty is not to decide the amount of damages we might have awarded, but whether the award is so flagrantly excessive as to give rise to a presumption of passion or prejudice. Given the lack of case law on civil damages cases involving facts such as the facts in this case to guide us, and the nature of plaintiffs' closing arguments, we decline to find a presumption of prejudice.

2. *Evidence of Passion or Prejudice.*

Having concluded the jury's verdict is not so excessive so as to raise a presumption of passion or prejudice, we turn to whether the record affirmatively

---

[3] We presume that was a reference to a jury verdict resulting from a lawsuit claiming the plaintiff was injured when hot coffee was served to her and spilled on her. *See Liebeck v. McDonald's Rests., P.T.S., Inc.*, No. CV-93-02419, 1995 WL 360309, at *1 (N.M. Dist. Ct. Aug. 18, 1994) (entering judgment for plaintiff in the amount of $160,000 in compensatory damages and $2.7 million in punitive damages), *vacated*, No. CV-93-02419, 1994 WL 16777704, at *1 (N.M. Dist. Ct. Nov. 28, 1994); *see also* Caroline Forell, *McTorts: The Social & Legal Impact of McDonald's Role in Tort Suits*, 24 Loy. Consumer L. Rev. 105, 138 (2011) (noting the money Liebeck ultimately received was subsequently settled confidentially).

establishes passion or prejudice on the part of the jury. *See Jasper*, 764 N.W.2d at 771; *Daniels*, 761 N.W.2d at 51.

Hohenshell generally points to the plaintiffs' alleged "desire to enflame [the jury's] passions and punish Hohenshell" as evidence that the jury was prejudiced against him. Hohenshell first seems to argue the statements made by counsel and the prospective jurors during jury selection establishes that the jury was prejudiced against him. We readily reject Hohenshell's argument that voir dire is evidence that the jury resorted to passion or prejudice in reaching its verdict. The argument is largely premised on exchanges that were had between counsel and jurors who did not end up serving on the jury. The jury ultimately consisted of jurors 3, 6, 7, 9, 12, 15, 16, 17, and 22 (as an alternate). Jurors 3, 7, 9, 12, 15, and 22 all generally indicated they could impartially consider the evidence despite the heinous nature of the crime of which Hohenshell was convicted. Juror 6 agreed that individuals who engage in crimes against children should "do time," but she never gave any indication that she could not impartially consider the evidence. Juror 16 agreed that individuals who sexually assault children should be subjected to criminal punishment, but she noted she would need to see proof to award civil damages because "he's already been punished for the crime." Juror 17 noted his belief that people who *murder* children should be subject to harsh criminal punishment, but he made no indication that he would be unable to impartially consider the evidence in this case.

Second, Hohenshell complains of the plaintiffs' counsel's remarks to the jury in opening statements and closing arguments. We fully acknowledge that some of the statements made by counsel were clearly intended to invoke a desire

on the part of the jury to punish Hohenshell. However, the complained-of statements by the plaintiffs' counsel concerned punitive damages, the purpose of which is to "punish bad behavior and deter future bad conduct." *Miranda v. Said*, 836 N.W.2d 8, 34 (Iowa 2013). Likewise, the jury was instructed punitive damages may be awarded "to punish and discourage the defendant and others from like conduct in the future." That is exactly what the plaintiffs' counsel was asking the jury to do. In any event, the jury was instructed it was required to reach its verdict upon the evidence presented, which does not include "[s]tatements, arguments, questions and comments by the lawyers." Appellate courts "presume juries follow the court's instructions." *State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010). Upon our review of the record, we are unconvinced that counsel's remarks in opening statements and closing arguments amount to evidence that the jury's verdict was a result of passion or prejudice.

Third, Hohenshell argues the following testimony on the part of J.G.'s father is evidence the jury was afflicted by passion or prejudice:

> I want to send a statement. I want this guy to pay. Two years and four months in jail is not payment to me—not even close—of what he's done to this little girl. . . . I want him to have nothing. . . . [H]e took everything from her. He should have nothing. I want . . . this to make the news. . . . [I]f just one person decides it's not worth doing this to a little girl, it would be worth all this.

Even assuming this testimony was intended to incite the passions and prejudices of the jury members, we find no evidence that affirmatively establishes it served its purpose. The jury was instructed:

> As you consider the evidence, do not be influenced by any personal sympathy, bias, prejudices or emotions. . . . [Y]ou are to evaluate the evidence carefully and avoid decisions based on generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.

On the issue of compensatory damages, the jury was additionally instructed its "judgment must not be exercised arbitrarily, or out of sympathy or prejudice, for or against the parties." Again, we assume the jury followed the court's instructions, and we are therefore satisfied its verdict was not the result of passion or prejudice against Hohenshell. *Id.* Furthermore, "the fact that a damage award is large does not in itself . . . indicate that the jury was motivated by improper considerations in arriving at the award." 58 Am. Jur. 2d *New Trial* § 276 (Nov. 2018 update); *see also Daniels*, 761 N.W.2d at 50 (quoting 58 Am. Jur. 2d *New Trial* § 313, at 313 (2002)).

The efforts on the part of the court and the trial attorneys to select a jury that would not be swayed by passion or prejudice can be described as nothing less than meticulous. True, the jury was presented with argument and testimony that may have been intended to invoke its passions and prejudices, but we find nothing in the record that affirmatively establishes the jury's predisposition that it could impartially consider the evidence gave way to improper considerations in reaching the verdict. The district court specifically noted in its ruling on the new trial motion that it "did not observe actions or reactions by any juror that evidenced or appeared to raise a concern that passion or prejudice was in any way influencing jurors individually or collectively at any point in time." We give weight to this assessment.

We also find persuasive the jury's specifications of damages in light of counsels' closing arguments. Plaintiffs' counsel asked for compensatory damages for J.G. in the total amount of $30 million; the jury awarded $50 million. He asked for loss-of-consortium damages of $5 million for each parent; the jury awarded $1

million to each. He asked for punitive damages between two and four times compensatory damages; the jury awarded roughly one and a half times J.G.'s compensatory damages. Counsel for Hohenshell offered no specific guidance on damage amounts, but he tried to convince the jury his client was being sufficiently punished by the criminal justice system, J.G. no longer needs therapy, and it is speculation to expect she will have problems in the future as a result of the sexual assault in this case. Although we have no knowledge of how the jury determined the particular damages amounts, we note the awards demonstrate a measured approach following the only guidance given them—from plaintiffs' counsel—resulting in damages that were: 66% more compensatory damages for J.G. than requested; only 20% of the loss-of-consortium damages requested; and punitive damages of one and a half times compensatory damages as opposed to two to four times as proposed. Clearly, the jury exercised judgment in determining the damages, demonstrating structure rather than passion or prejudice.

Finding no evidence in the record that affirmatively establishes the jury was influenced by passion or prejudice in reaching its verdict, we conclude the district court did not abuse its discretion in denying Hohenshell's motion for a new trial on the ground that the award of damages was influenced by passion or prejudice on the part of the jury.

B.     Sufficiency of the Evidence

Next, Hohenshell argues the "$50,000,000 compensatory damage award for J.G. is excessive and not supported by the evidence."[4] He complains the

---

[4] Hohenshell's brief on appeal devotes one paragraph to the loss-of-consortium claims, with no citation to authority in support of the argument. That is insufficient to mount a

evidence does not include medical records or bills and additionally contends J.G.'s therapist's testimony indicates any issues flowing from her encounter with Hohenshell were "resolved" at the time of trial.

### 1. *Preservation of Error*

The plaintiffs contest whether Hohenshell preserved error on his sufficiency-of-the-evidence claims. In reviewing a district court's ruling on a motion for a new trial, appellate courts only consider issues that were raised in the new trial motion. *See Lotz v. United Food Mkts.*, 283 N.W. 99, 101–02 (Iowa 1938); *Clark v. Berry Seed Co.*, 280 N.W. 505, 507 (Iowa 1938); *Shultz v. Shultz*, 275 N.W. 562, 563–64 (Iowa 1937); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). In his new trial motion, Hohenshell only specifically argued the evidence was insufficient to support the jury's award of "$20 million towards [J.G.'s] future loss of . . . mind and body and future physical, mental pain and suffering." Hohenshell did not specifically challenge the sufficiency of the evidence as to the damage awards concerning J.G.'s past loss of mind and body and physical and mental pain and suffering or the parents' past and future loss of consortium. At the subsequent hearing on the new trial motion, Hohenshell argued "the evidence clearly fails to meet the substantial proof requirement for future damages." He then directed his argument to the cumulative awards of $20 million for "future loss

---

challenge on appeal, especially since the title of the argument section only directs us to J.G.'s damages. *See McCleeary v. Wirtz*, 222 N.W.2d 409, 417 (Iowa 1974) (noting "random discussion" of an issue "will not be considered" on appeal).

of mind and body and pain and suffering for J.G." and additionally addressed future damages for the loss-of-consortium claims. When asked by the court whether he was only challenging specific items of damages, Hohenshell's counsel responded: "Yes. I am arguing specific elements, both the future damages for loss of consortium, the future damages for the pain and suffering, and loss of mind and body of J.G." Hohenshell went on to argue, because the evidence was insufficient to support the awards for future damages, the jury must have acted out of passion or prejudice. In its ruling on the new trial motion, the court limited its consideration to future damages for J.G.'s loss of mind and body and physical and mental pain and suffering and the parents' loss of consortium. The court did not consider the sufficiency of the evidence as to any past damages.

As noted, Hohenshell now argues on appeal that the "$50,000,000 compensatory damage award for J.G. is excessive and not supported by the evidence." This would include the damages awarded for J.G.'s past loss of mind and body ($15 million), past physical and mental pain and suffering ($15 million), future loss of mind and body ($10 million), and future physical and mental pain and suffering ($10 million). As detailed, however, Hohenshell only challenged, and the district court only considered and ruled upon, the sufficiency of the evidence concerning the future specifications of damages. Consequently, error has only been preserved on Hohenshell's appellate challenges to the sufficiency of the evidence for those damages. *See Meier*, 641 N.W.2d at 537–41. We will not consider the challenges to the other items of damages for the first time on appeal.[5]

---

[5] Hohenshell appears to concede trial counsel failed to make a record on the issues we have deemed are not preserved, but he seems to argue such failure does not preclude

2.      *Merits*

Hohenshell does not claim the evidence presented does not support any award of damages, he only argues the evidence does not support the jury's award. For the reasons discussed above, we limit our consideration to the jury's awards for J.G.'s future loss of mind and body and physical and mental pain and suffering.

Hohenshell did not object to the jury instructions concerning damages. Consequently, they are the law of the case. *In re Estate of Workman*, 903 N.W.2d 170, 176 (Iowa 2017). The jury was instructed that the noneconomic damages sought by the plaintiffs could not "be measured by any exact or mathematical standard." The instructions defined loss of mind and body as "the inability of a particular part of the mind and/or body to function in a normal manner." Physical pain and suffering was defined to include, but not be limited to, "bodily suffering or discomfort." Mental pain and suffering was defined to include, but not be limited to, "mental anguish or loss of enjoyment of life." The evidence shows J.G. was seventeen years old at the time of trial, and the jury was instructed that, based on statistics, she would be expected to live another 64.17 years.

---

appellate review. He cites *Schmitt*, 170 N.W.2d at 660, to support his position. We disagree with the position that *Schmitt* amounts to an exception to the error-preservation requirement. There, the supreme court explained:

> [T]he *trial* court in its consideration of a motion for new trial is not limited by the status of the record . . . when it feels the verdict fails to administer substantial justice or it appears the jury has failed to respond truly to the real merits of the controversy. . . . [T]he *trial* court has the inherent right to grant another trial where substantial justice has not been effectuated.

*Schmitt*, 170 N.W.2d at 660 (emphasis added). Although the trial court is not limited by the status of the record made on a motion for a new trial, the supreme court additionally indicated that *appellate* courts are limited by the status of the record when counsel fails to make a proper record which would authorize appellate review. *See id.* This indication mirrors the general error-preservation requirement.

Damages for loss of mind and body and physical and mental pain and suffering are noneconomic in nature. *See Matthess v. State Farm Mut. Auto. Ins. Co.*, 521 N.W.2d 699, 703 (Iowa 1994); *see also* Restatement (Second) of Torts § 905 (Am. L. Inst. 1979). While economic damages can be measured by some valuation standard, *see, e.g.*, 22 Am. Jur. 2d *Damages* § 3 (Nov. 2018 update), noneconomic damages, as the jury was instructed, "cannot be measured by any exact or mathematical standard and must be left to the sound judgment of the jury." *Estate of Pearson*, 700 N.W.2d at 347; *accord Oldsen v. Jarvis*, 159 N.W.2d 431, 434 (Iowa 1968). For this reason, we readily dismiss Hohenshell's complaint that no "medical records" or "medical bills" were presented to "quantify or otherwise indicate the extent and nature" of J.G.'s future damages. We do, however, agree with Hohenshell that "[e]ven noneconomic damages have to have some basis in fact." Hohenshell's position seems to be that the jury's award of damages has no basis in fact because "any mental defect suffered by J.G. had essentially resolved [by] the point of trial" and the evidence presented "merely hints as to possibilities of future treatment." As to the latter complaint, the challenged awards were not to compensate J.G. for possible future treatment; they were to compensate her for loss of mind and body and pain and suffering. As to the former, the assertion that the evidence suggests J.G.'s issues resulting from her encounter with Hohenshell were resolved is a far cry from what the evidence really shows. Rather, the evidence shows the way J.G.'s mind operates has been altered; she is a mere shell of her former self; she lives in fear; she suffers from depression, post-traumatic stress disorder, panic attacks, and anxiety; and she has an inclination toward self-harming behavior. Although J.G.'s commitment to therapy in its early

stages prepared her to better cope with these issues, her therapist testified the issues are not resolved and will be with her for the rest of her life.

As we noted above, the closing argument by Hohenshell's counsel was in two parts: (1) a focus on how the criminal justice system was already punishing Hohenshell and how he would be punished in the future; and (2) how well J.G. had already recovered from the criminal acts against her. He did not offer the jury any guidance on how to measure or award damages.[6] In this appeal, Hohenshell asks us to either reduce the damages award[7] or order a new trial.

Valuing damages such as these is a nebulous task. The evidence is clear that J.G. will continue to suffer in the future, more likely than not for the rest of her life. This court cannot place a value on what she will go through in dealing with the after effects of being sexually assaulted by Hohenshell at the tender age of thirteen years. As was the district court, we are unable to value the "damages awarded for the loss of a child's innocence." It is best to leave such a valuation to a jury. As the supreme court has stated:

> [T]he jury was in the best position to judge the credibility of the witnesses and to make the judgment call about what the noneconomic elements of damages were worth. That is exactly what juries are for. We should not set aside a verdict simply because we might have reached a different conclusion. Were we to do so, we would be relegating juries to "unimportant window dressing."

---

[6] We are not critical of counsel, only recognizing the facts of the case. We recognize strategic reasons why counsel would consider making no specific recommendations.

[7] When we asked Hohenshell's counsel at oral arguments to identify what he thought would be an appropriate damages award for this court to approve, he replied between $10,000 and $100,000.

*Matthess*, 521 N.W.2d at 704 (quoting *Lantz v. Cook*, 127 N.W.2d 675, 677 (Iowa 1964)).

Upon our review, we are unable to say the challenged awards were excessive in light of the evidence presented. Consequently, we conclude the district court did not abuse its discretion in denying Hohenshell's motion for a new trial or alternatively ordering a remittitur of damages, even though Hohenshell never requested such a remittitur.

## IV. Punitive Damages

Finally, Hohenshell challenges the jury's punitive damages award as in violation of his due process rights. The due process argument was not raised in the district court and, consequently, the plaintiffs contest error preservation. However, "it is a denial of due process for a state to allow punitive damages without according appellate review of the appropriateness of the amount" and we are "obliged as a matter of constitutional law to assume responsibility for reviewing the appropriateness of the size of punitive damage awards." *Ezzone v. Riccardi*, 525 N.W.2d 388, 398–99 (Iowa 1994); *accord Wilson v. IBP, Inc.*, 558 N.W.2d 132, 144 (Iowa 1996) (noting our responsibility for reviewing the appropriateness of the size of a punitive damage awards regardless of whether a party mounts a constitutional challenge). We proceed to the merits.

The United States Supreme Court has expressed three guideposts for consideration in determining whether a punitive damages award is unconstitutionally excessive:

(1) the degree of reprehensibility of the defendant's misconduct;
(2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference

between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *accord B.M.W. of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Campbell*, 538 U.S. at 419.

A.      Degree of Reprehensibility

"The degree of reprehensibility of the defendant's conduct is said to be the most important indicium of the reasonableness of a punitive-damage award." *Wolf*, 690 N.W.2d at 894; *accord Campbell*, 538 U.S. at 419. A number of factors are to be considered in determining the reprehensibility of a defendant's conduct, whether:

> (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) the conduct involved repeated actions or was an isolated incident; and (4) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Wolf*, 690 N.W.2d at 894 (altered for readability) (quoting *Campbell*, 538 U.S. at 419). First, there is no question that the harm caused was noneconomic in nature. Next, Hohenshell's sexual assault of J.G. unquestionably evinces an indifference to or reckless disregard to the health or safety of others. On the third factor, we acknowledge that this incident, while egregious, was an isolated one. On the final factor, however, the harm caused was unquestionably a result of Hohenshell's ill will and not a mere accident.

Upon our de novo review of the record, we find the degree of reprehensibility of Hohenshell's conduct supports the jury's punitive damages award.

### B. Disparity Between Actual or Potential Harm and the Punitive Damages Award

Hohenshell simply argues the "$75 million punitive damage award here is irreconcilable with the $52 million compensatory damage award, so it violates the due process requirements." The Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Campbell*, 538 U.S at 425. However, the Court has advised that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Id.* The following was the closest the Court came to delineating a bright-line rule: "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* Even so, "[a] higher ratio may also be justified in cases in which injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582.

Here, the ratio between punitive and compensatory damages is 1.44 to 1. We do not view this disparity between actual or potential harm and the punitive damages award so great as to amount to a due process violation and therefore require elimination or reduction of the award, or a new trial. *Cf. May v. Nationstar Mortg., LLC*, 852 F.3d 806, 817 (8th Cir. 2017) ("[T]he 8-to-1 ratio . . . 'does not set off any alarm bells,' and it is not unconstitutionally excessive."); *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 366 (3d Cir. 2015) ("[A]

5:1 ratio is not the type of gross disparity between compensatory and punitive damages that renders a punitive award suspect by itself."); *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 976 (8th Cir. 2014) ("[A] 3:1 ratio does not indicate unconstitutionally excessive punitive damages."); *Equal Emp't Opportunity Comm'n v. AutoZone, Inc.*, 707 F.3d 824, 839–40 (7th Cir. 2013) (finding 2:1 ratio "well within the range of constitutionally acceptable values"), *reh'g en banc denied* (7th Cir. 2013); *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 804 (8th Cir. 2013) ("We conclude that a 5:1 ratio is within constitutional limits. This is not a case involving a ratio exceeding single digits."); *Myers v. Cent. Florida Invs., Inc.*, 592 F.3d 1201, 1222 (11th Cir. 2010) ("[T]he punitive ratio of 4.89:1 does not offend constitutional due process."), *reh'g en banc denied*, 401 F. App'x 552 (11th Cir. 2010), *cert. denied*, 562 U.S. 890 (2010); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 840 (8th Cir. 2005) ("We disagree a four-to-one ratio is *per se* unconstitutional."); *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366, 1371–72 (Fed. Cir. 2003) (finding ratio between punitive and compensatory damages of approximately 3:1 "lies well within the bounds of constitutional propriety"), *cert. denied*, 540 U.S. 1183 (2004); *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (concluding because ratio of roughly 7:1 is a single-digit ratio, it was "not constitutionally excessive"), *cert. denied*, 541 U.S. 902 (2004); *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (concluding ratio "in the neighborhood of 4:1" between punitive and compensatory damages "does not indicate that the punitive damages award violates due process").

C.    Difference Between Punitive Damages and Civil Penalties Authorized in Comparable Cases

"Another guideline to consider is the disparity between the punitive-damage award and the civil or criminal penalties authorized or imposed in comparable cases." *Wolf*, 690 N.W.2d at 896. We note this guidepost has been described as the least useful one in determining whether a punitive damages award is excessive. Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, and the Outlier Dilemma*, 66 Hastings L.J. 1257, 1270 (2015).

Hohenshell compares the punitive damages award to the potential criminal penalties and those actually imposed as a result of his guilty pleas to lascivious acts with a child and five counts of providing alcohol to a minor. Ignoring the fact that Hohenshell agreed to plead guilty in return for a lesser charge, this would be somewhat similar "to determining the appropriate amount of punitive damages in a drunk driving death case by looking to the monetary fine levied for operating under the influence." *Cf. Christensen v. Good Shepherd, Inc.*, No. 17-0516, 2018 WL 2731626, at *10 (Iowa Ct. App. June 6, 2018). We find the comparison useless in considering this guidepost.

Although some courts, in considering this guidepost, have considered punitive damages awarded in similar civil cases,[8] in addressing this guidepost,

---

[8] *See, e.g.*, *Trickey*, 705 F.3d at 804 ("Addressing the third . . . guidepost, this court must also compare damages awarded in similar civil cases."); *Morris v. Flaig*, 511 F. Supp. 2d 282, 310–13 (E.D.N.Y. 2007) ("This final factor requires a comparison to awards authorized in similar cases."); *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1100 (Colo. 2011) (concluding defendant was on notice of potential for amount of exemplary damages due to other similar cases upholding large exemplary damages); *Cody P. v. Bank of Am., N.A.*, 720 S.E.2d 473, 484–85 (S.C. Ct. App. 2011).

Hohenshell does not direct our attention to any cases that would indicate the punitive damages award here is excessive. In any event, an award of punitive damages is based on the "facts and circumstances unique to the particular case"— "no two cases are truly identical, meaningful comparisons of such awards are difficult to make." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 457 (1993).

After considering the three guideposts, we conclude the punitive damages award was not excessive.

**V.     Conclusion**

We affirm the district court's denial of Hohenshell's motion for a new trial.

**AFFIRMED.**